(No. 106976.—

MARIA KOUZOUKAS, Appellee, v. THE RETIRE-
MENT BOARD OF THE POLICEMEN'S ANNU-
ITY AND BENEFIT FUND OF THE CITY OF
CHICAGO, Appellant.

*Opinion filed September 24, 2009.*

David R. Kugler, of Chicago, for appellant.

Paul D. Geiger, of Chicago, for appellee.

Mary Patricia Burns and Vincent D. Pinelli, of Burke Burns & Pinelli, Ltd., of Chicago, for *amicus curiae* Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago.

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

## OPINION

The Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago (the Board) denied the application of Maria Kouzoukas (Kouzoukas) for duty disability benefits. On administrative review, the circuit court of Cook County reversed the Board's decision and awarded Kouzoukas prejudgment interest. After the appellate court affirmed the circuit court's judgment (383 Ill. App. 3d 942), the Board petitioned for review by this court and we allowed the petition.

For reasons that follow, we now affirm the appellate court's judgment that the Board's decision to deny Kouzoukas' application for duty disability benefits should be set aside. However, we reverse the award of prejudgment interest.

### BACKGROUND

Maria Kouzoukas became a Chicago police officer in 1995. On July 25, 2004, while on patrol, she injured her back when she attempted to move an intoxicated man off the sidewalk and he resisted. After the incident, Kouzoukas immediately sought treatment at the emergency room of Resurrection Medical Center and went on medical leave the following day. Kouzoukas returned to work on September 17, 2004, but due to recurring back pain stemming from her injury, she went back on medical leave on October 23, 2004. Over the next 14 months, Kouzoukas was able to work restricted duty for brief periods of time, but otherwise remained on medical leave due to lower-back pain. On December 15, 2005, when her

medical leave was exhausted, Kouzoukas applied to the Board for duty disability benefits.

Upon application for benefits, Kouzoukas was required to be examined by the Board's physician, Dr. S. David Demorest. That occurred on December 29, 2005. Subsequently, on March 30, 2006, and April 25, 2006, the Board held hearings on Kouzoukas' application. At these hearings, Kouzoukas presented documentary evidence and witness testimony regarding her disability and the medical treatment she received since her injury in July 2004. Because our review requires us to determine whether the manifest weight of the evidence supports the Board's decision to deny Kouzoukas disability benefits (*Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 505 (2007), quoting *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006)), we set forth this evidence in detail.

The documentary evidence reveals the following. After being treated and discharged by Resurrection Medical Center on July 25, 2004, Kouzoukas was evaluated at MercyWorks Occupational Medicine Center on July 27, 2004. There she was diagnosed with acute lumbar strain, given a muscle relaxant, and told to perform certain exercises at home. MercyWorks reported to the Chicago police department that Kouzoukas would be unable to return to work for two to three weeks, but that no permanent disability was anticipated.

On August 10, 2004, Kouzoukas was evaluated by Dr. Michael Lewis, an orthopedic surgeon. His examination revealed paravertebral muscle spasm in the dorsal and lumbar spine area and his initial diagnosis was "acute dorsal and lumbar myofascitis" (inflamation of the tissue surrounding the muscle). Although Kouzoukas had suffered a back injury on two prior occasions—the first in May 2002 with 113 days medical leave taken between May 1 and September 19, 2002, and the second in June

2003 with 45 days medical leave taken between June 29 and August 12, 2003—Dr. Lewis indicated in his report that he believed Kouzoukas' current back pain was due to her recent injury and was unrelated to her previous injuries. He prescribed pain medication and ordered Kouzoukas to remain on medical leave.

Dr. Lewis saw Kouzoukas for follow-up on August 23, September 7, and September 14. On September 14, 2004, Dr. Lewis released Kouzoukas to return to work on September 17, 2004, for a restricted or "light duty" assignment. On October 12, 2004, Dr. Lewis saw Kouzoukas, who still complained of having constant and persistent back pain. Dr. Lewis noted muscle spasm in the lumbosacral spine and ordered an MRI scan for further evaluation. He recommended that Kouzoukas continue working a light duty assignment and suggested that she begin a course of physical therapy. Kouzoukas began therapy on October 15, 2004, and continued to work restricted duty until October 23, 2004, when she went back on medical leave due to increased back pain.

On October 27, 2004, the MRI scan was performed. It revealed some mild disc protrusion at L4-L5 and L5-S-1, as well as some minimal scoliosis at the lumbar joint. As a result, when Dr. Lewis saw Kouzoukas on October 28, he recommended that Kouzoukas remain off work and that she continue physical therapy.

After a November 8, 2004, examination, Dr. Lewis reported to the Chicago police department that Kouzoukas was still experiencing moderate to severe back pain that was being helped somewhat by physical therapy. Dr. Lewis released Kouzoukas to return to restricted duty on November 12, 2004, with an anticipated return to full active duty on November 29, 2004. Dr. Lewis also recommended Kouzoukas continue with physical therapy. Kouzoukas returned to work on November 11, 2004, but worked only five days before going back on medical leave.

In a report dated November 30, 2004, AthletiCo Therapy advised Dr. Lewis that Kouzoukas had attended five sessions, missed one session, and cancelled two sessions. Under the heading of "assessment" the report stated that Kouzoukas made "limited progress" with physical therapy, that she continued to complain of lower back pain, and that the radiating symptoms did not resolve. Her prognosis for recovery was listed as "fair." Although Kouzoukas was authorized to receive additional therapy, she was discharged because she failed to keep scheduled appointments or return phone calls to reschedule after November 1, 2004.

Kouzoukas went back on medical leave on November 15, 2004, and remained there until January 16, 2005. She returned to restricted duty on January 16, 2005, and worked until March 29, 2005. She then went back on medical leave due to recurring back pain.

On April 5, 2005, Kouzoukas's general physician sent her for an MRI scan of her cervical spine. The MRI showed no abnormality or infirmity. Kouzoukas then consulted with Dr. Gary Magee on May 2, 2005. He reviewed Kouzoukas' MRI scans and confirmed that they showed no abnormality except for a slight stenosis at the L4-L5 level of the spine. Because Kouzoukas reported that she had not obtained relief with physical therapy or oral medication, Dr. Magee recommended epidural injections.

On May 19, 2005, Kouzoukas returned to Dr. Lewis, informing him that her pain had returned in March 2005. Dr. Lewis noted severe muscle spasm and reduced forward flexion. He, too, recommended that Kouzoukas receive lumbar steroid injections. As a result, Kouzoukas received an injection on June 7, 2005. However, after this initial injection, the treatment was discontinued because Kouzoukas reported that she had a headache and increased pain radiating down her leg as a result of the

injection. Dr. Lewis then referred Kouzoukas to a spine surgery specialist for an evaluation for possible surgical intervention.

In July 2005, Kouzoukas saw Dr. Spencer, a spine surgery specialist. After his initial examination, Dr. Spencer's diagnosis was "chronic low back pain and right-sided sciatica." He opined that Kouzoukas' back pain was "aggravating, but not incapacitating." However, he sent Kouzoukas for a new MRI scan of her spine and recommended that she continue her light duty work assignment.

On August 8, 2005, Kouzoukas returned to Dr. Spencer's office. He advised Kouzoukas that her MRI was "totally normal" and stated that, in his view, there was nothing wrong with her back. He recommended that she see a gynecologist or internist to determine the source of her pain. Dr. Spencer released Kouzoukas to return to work with a temporary 20-pound lifting limit. In his report to the Chicago police department, Dr. Spencer stated, "I believe that her pain is not coming from an identifiable injury in her lumbar spine based on the pristine appearance on the MRI scan."

In September 2005, Kouzoukas began treatment with Dr. Yapor, a neurosurgeon at Northwestern Memorial Hospital. He sent Kouzoukas to have EMG/NCV testing to determine whether she had neurological damage. He also ordered a CT scan and X-rays of the sacroiliac (SI) joint. The testing revealed no neurological damage or other pathology. Unable to locate the source of Kouzoukas' pain, Dr. Yapor suggested that Kouzoukas start a pain management program with Dr. Konowitz for her "chronic low back pain syndrome." Accordingly, Kouzoukas saw Dr. Konowitz for an evaluation on November 17, 2005. Dr. Konowitz initially recommended that Kouzoukas see her gastroenterologist for treatment of her gastric infection.

In a report to the Chicago police department dated December 13, 2005, Dr. Yapor opined that Kouzoukas was "permanently disabled as a police officer" because she could not perform the duties of an active police officer. On December 19, after receiving results of Kouzoukas' cervical spine MRI which revealed no pathology, Dr. Yapor determined that, as a surgeon, he could do nothing to help Kouzoukas and discharged her from his care.

On December 20, 2005, Dr. Konowitz gave Kouzoukas an injection directed at her SI joint, but she reported no significant improvement. Oral medications were given for pain management, including Protonix, Skelaxin, and Mobic. Once again, Kouzoukas was referred for physical therapy.

Kouzoukas was seen by Integrity Physical Therapy for an initial evaluation on January 22, 2006. The evaluation form described Kouzoukas' functional capabilities as follows:

"The patient is currently unable to work due to injury. *** She reports pain with sitting, standing, and driving in her car for more than 5-10 minutes."

Progress notes from Integrity indicate that Kouzoukas was "totally noncompliant" with therapy—she left her first appointment early because she "had to babysit" and in March 2006 she missed her appointments altogether. When Kouzoukas called to cancel her March appointments, she explained that she was "going out of town."

Dr. Konowitz, in a progress letter to Dr. Yapor dated March 23, 2006, stated:

"Patient requested clarification on work disability. Her severe SI joint pain is provoked with prolonged sitting and prolonged standing approximately 45 minutes. This difficulty in completing her work as a police officer is the issue relating to her disability. Due to the significant subjective pain complaints over her SI joint and pain scores of 8 and 10, I am unable to return her to duty."

After receiving this letter, Dr. Yapor sent a letter on April 17, 2006, to Kouzoukas' attorney, Mr. Geiger, stating the following:

"Based on my evaluation of Ms. Kouzoukas, as well as Dr. Konowitz's last report, she is to limit her sitting, standing and continuous walking to no more than 30-45 minutes at any one time. She is not to wear her gun belt, indefinitely."

In addition to the documentary evidence, witness testimony was presented at the hearings before the Board. On March 30, 2006, when the Board held its first hearing on Kouzoukas' application for duty disability benefits, Kouzoukas testified that she filed the claim for duty disability benefits because her July 2004 injury prevented her from returning to the Chicago police department as a police officer. She then called her treating physician, Dr. Yapor, to testify in support of her claim.

Dr. Yapor testified that he is a neurological surgeon and that he first saw Kouzoukas in 2005, after she was referred to him by the Information on Demand Unit of the Chicago police department. Dr. Yapor admitted that Kouzoukas' MRI scans and X-rays revealed nothing of "surgical significance." Nonetheless, he testified that there was objective evidence of pain—his physical examination which revealed localized tenderness in her lower back around the right sacroiliac (SI) joint. He stated further that, based on his observations, he believed Kouzoukas suffered from lower back pain which generated from her SI joint and that her pain caused her to have difficulty sitting or standing for any period of time. Dr. Yapor testified that he did not believe that Kouzoukas was malingering or faking her pain. He explained that he discontinued his care of Kouzoukas in December 2005 because she was not a surgical candidate, but that he referred her to Dr. Konowitz for pain management.

Dr. Yapor was asked whether he believed Kouzoukas

could work as a Chicago police officer. He responded "no" and explained his reasons:

> "Several factors. One is her physical condition and the fact that she does get exacerbations, and number two is her medications. From a physical factor standpoint, I believe that any prolonged sitting or prolonged standing in one area, prolonged walking, tends to cause her to have flare-ups."

Asked to define "prolonged," Dr. Yapor stated, "within an hour, half an hour to forty-five minutes." Based on his assessment of Kouzoukas' physical restrictions, Dr. Yapor testified that, in his opinion, Kouzoukas could not even perform desk duty, primarily because the weight of the gun belt police officers are required to wear exacerbated her symptoms.

Dr. Yapor further testified that his opinion that Kouzoukas could not be a police officer was based on his concern, not only for Kouzoukas, but for any partner she might have, because her physical deficits would prevent her from performing her duties fully. Also, Dr. Yapor explained, some of the medications Kouzoukas was taking would prevent her from operating machinery, such as an automobile, while others might affect her judgment or reflexes.

When asked to give his prognosis for Kouzoukas, Dr. Yapor stated that, due to the chronicity of her pain, "the issue at this time is pain control as opposed to pain elimination. And it is the means by which we are trying to control the pain which I think is my biggest concern with her working as a police officer."

On cross-examination, Dr. Yapor was asked about Dr. Spencer's report, in which Dr. Spencer had indicated his belief that Kouzoukas "does not really have a back problem or injury." Dr. Yapor responded that he agreed with Dr. Spencer that there was nothing "surgically wrong" with her back and that he, too, did not believe

Kouzoukas' pain generated from her spine. Dr. Yapor explained that "the back" is an anatomical area of the body, while the spine is a specific organ system. He stated that a person can have low back pain for any number of reasons, many having nothing to do with the spine. He testified that low back pain may result from problems with the kidneys, the ovaries, the uterus, or the intestines. In this case, however, Dr. Yapor believed that Kouzoukas suffered from lower back pain which generated from the SI joint and that the cause of the pain was the injury which occurred on July 25, 2004.

Dr. Yapor was asked what objective findings supported his belief that Kouzoukas had a problem with her SI joint. He responded: "There was no anatomical disruption of the joint; however, if someone steps on your foot and your foot hurts, you can do an x-ray and it's normal. The problem is not always able to be diagnosed radiologically." Further, Dr. Yapor explained that Kouzoukas' condition—myofascial pain syndrome—is a condition where all of the tests are negative, but the patient still suffers from pain. In other words, the fact that tests show no injury or abnormality, or the fact that no surgical intervention is needed, does not mean that the patient is not experiencing actual pain.

The next witness to testify was the Board's physician, Dr. Demorest. He testified that when he examined Kouzoukas on December 29, 2005, he noticed "an abnormal and marked spasm (or tightening) of the paraspinal muscles on the left from T7 to the lower lumbar." He also noted that Kouzoukas exhibited decreased ability in her flexion and lateral bending. As a result, Dr. Demorest concluded (as did Dr. Yapor) that Kouzoukas suffered from "myofascial pain syndrome," which he defined as "a dysfunction of her muscles, ligaments, and tendons of her lower back." Dr. Demorest

also agreed with Dr. Yapor that Kouzoukas showed no signs that she was malingering or exaggerating her pain.

Dr. Demorest was asked why he had not included in his report to the Board an opinion on whether Kouzoukas could return to work. He explained that, typically, he will advise the Board if the person is clearly unable to return to work, *i.e.*, when the person cannot ambulate independently or is unable to hold a gun. However, he stated that when the disability is not as clear cut, he believed his role was to provide the facts to the Board and allow the Board to decide whether or not the person could return to work. Nevertheless, Dr. Demorest also testified that he "had reservations" about returning Kouzoukas to full, unrestricted duty and added that, in his opinion, returning Kouzoukas to full duty "would not be prudent." Dr. Demorest further testified that he had not recommended in his report that Kouzoukas return to restricted duty because he had no knowledge regarding the availability of positions within the Chicago police department which could accommodate Kouzoukas' restrictions. Dr. Demorest then testified that Kouzoukas could work under the following conditions:

"If she is able to sit and change positions frequently and doesn't have to stand for prolonged periods of time, if they can accommodate her, then she could be employed."

Dr. Demorest was then questioned about Kouzoukas' ability to function while taking her medications. He testified that Kouzoukas' medications did not overly concern him because the types of medications Kouzoukas was taking generally did not pose a problem once the patient had adjusted to them. He testified that, in his view, the medications should not prevent her return to work.

Kouzoukas was then called to testify regarding her present condition. She testified that her pain is constant, though exacerbated by activity. Describing her pain, she said it was "excruciating," "shooting pains" that are

"hot and searing, going down my leg, sometimes to the bottom of my foot to my big toe." She testified that the pain does not allow her to do many of the activities she routinely did before her injury. Also, Kouzoukas noted that since the injury, whenever she attempted to return to work, one of the main problems was wearing her gun belt because it added a lot of pressure to her back and hips.

With regard to medications, Kouzoukas testified that she currently takes Neurotin, Valium, Vicodin (as needed), Mobic, Ultram (an anti-inflammatory), and Lidocaine patches. Kouzoukas then testified that she loves her job, wants to return to work, and that she is currently attending rehabilitation three times per week in an attempt to do so.

On cross-examination, Kouzoukas was asked about her missed therapy appointments. Kouzoukas explained that she missed some appointments when she went out of town for a wedding and when she went on a vacation to Mexico. Kouzoukas testified that when she went on these trips she was able to fly only because she was heavily medicated. Kouzoukas further explained that she missed other therapy appointments because there had been a mix-up on the location and because the clinic scheduled appointments without checking with her. She testified that the problems were now resolved and her attendance was no longer an issue.

Kouzoukas testified that she is able to drive, but only for short distances around her neighborhood. Also, she said that she never drives when she has taken certain medications. When asked whether she had gone to the gun range to requalify, Kouzoukas admitted that she had not.

After Kouzoukas testified, the hearing was continued so that someone from the Chicago police department's medical section could be brought in for questioning. The

hearing reconvened at the next regular Board meeting on April 26, 2006. Prior to the commencement of the hearing, the Board noted that it had received the March 26, 2006, report by Dr. Konowitz and the April 17, 2006, report by Dr. Yapor. The Board agreed to take these two documents into consideration. Michael Schaedel, the commanding officer of the Chicago police department's medical services was then called to testify.

Officer Schaedel testified that a person who has been on medical leave may return to full duty if the person can fire a weapon, ambulate independently, and otherwise perform the functions of a police officer. Officer Schaedel also testified that the Chicago police department has a number of restricted duty positions, some of which do not require the officer to wear a gun belt. In addition, he testified that, with regard to the gun belt, accommodations could be made—such as having the officer wear a smaller, lighter gun, or having them wear a shoulder holster, ankle holster, or "crossdraw holster." According to Officer Schaedel, an officer did not necessarily have to requalify on the gun range before being permitted to return to certain light duty work. Further, he testified that accommodations could be made for any standing and sitting restrictions.

As to medications, Officer Schaedel testified that he was not qualified to determine whether an officer could return to duty while taking a particular medication. However, he agreed that an officer taking mind-altering drugs should not be permitted to return to work in any capacity.

Officer Schaedel then testified that he had read Dr. Yapor's April 17, 2006, report[1] and that nothing in the

_____

[1]This report was admitted into evidence at the beginning of the April hearing. The Board agreed to accept the report, despite the fact that it was prepared after Dr. Yapor had already testified.

report indicated to him that Kouzoukas could not return to a restricted duty assignment. He suggested that an appropriate assignment might be in the Alternate Response Section where the officers wear headsets and can move around their desks while taking calls. He admitted that such a position was never offered to Kouzoukas, but explained the reason was that Kouzoukas did not have a release from a doctor directing her to return to work for a light duty assignment.

On cross-examination, Officer Schaedel testified that he had been appointed commander of medical services only two weeks prior to his testifying. He admitted that he had no prior experience with medical services and had received no specialized training upon being appointed commander. Accordingly, his testimony regarding an officer's ability to work without a utility/gun belt or "duty belt" was based only on his observations and a phone call he made to the Alternate Response Section. In fact, Officer Schaedel admitted that he was aware of no Chicago police department general order or other written policy which permitted an officer to deviate from the prescribed regulation uniform of a Chicago police officer.

Officer Schaedel also testified that his opinion that Kouzoukas' medications did not prevent her from returning to work was based on information he received from the medical services administrator, who is a nurse. He said that, based on what the administrator told him, he did not believe that the medications Kouzoukas was currently taking were "mind-altering." Accordingly, he believed the only obstacle to having Kouzoukas return to

---

The report indicated that Kouzoukas was restricted to sitting, standing and continuous walking for no more than 35 to 45 minutes at one time. At the April meeting, the Board also admitted into evidence a report from Dr. Konowitz dated March 23, 2006. In this report, Dr. Konowitz stated that, because of Kouzoukas' restrictions, he could not release her for duty.

work for light duty was the fact that, to date, no doctor had given her a release.

After Officer Schaedel testified, Dr. Demorest was recalled to explain briefly the nature and purpose of certain medications Kouzoukas was presently taking. The hearing was then closed and the matter taken under advisement.

On May 26, the Board issued a written decision denying Kouzoukas' claim for duty disability benefits. The Board based its decision on its findings, which we quote verbatim:

"(C) Kouzoukas, from the medical records and testimony offered does not have any objective findings of a back, spine or SI joint injury; Kouzoukas' complaints of pain are subjective and do not prevent her full duty return to the [Chicago police department]. The [Chicago police department], at their election, can assign Kouzoukas to a full duty position with or without restrictions if they believe such is appropriate. Full duty [Chicago police department] employment is available for an officer with the subjective complaints of pain as expressed by Kouzoukas.

Dr. Spencer reporting that her symptoms, 'are aggravating, but not incapacitating.'

(D) Dr. Yapor was not a credible witness. The Board finding his testimony to be evasive and inconsistent. In part, and without limitation Dr. Yapor's reluctance to acknowledge there were no objective findings as to Kouzoukas' complaints of pain. Dr. Yapor then opining Kouzoukas unable to return to work because of the medication she was taking, none of which he prescribed, completely ignoring the medication issue in his final report, issued after he testified.

Dr. Yapor testified Kouzoukas did not have a back problem, (agreeing with Dr. Spencer) Dr. Yapor suggesting her problem was limited to her SI joint, but in December 13, 2005 report, Dr. Yapor stated 'the patient in my opinion should be considered to have a chronic low back syndrome.'

(E) Kouzoukas in addressing her claim of pain and disability was not a credible witness. The Board without

limitation references, 1) her testimony as to her inability to maintain, following the accident, her 5 or 6 day daily work. A medical report in November 2004, approximately 4 months after the incident indicated 'she is <u>currently</u> unable to run or work out.' (Emphasis in original) 2) Kouzoukas' failure to keep therapy appointments and her plane trips all raise questions as to her injury and the extent of her complaints of disabling pain."

The Board concluded that Kouzoukas was not disabled and that she did not meet her burden of proving that her injury was causally connected to the July 2004 incident.

Kouzoukas filed an action in the circuit court of Cook County seeking administrative review of the Board's decision pursuant to the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2006)). She also sought an award of prejudgment interest pursuant to section 2 of the Interest Act (815 ILCS 205/2 (West 2006)). On November 1, 2006, the circuit court entered an order reversing the Board's denial of Kouzoukas' claim for duty disability benefits and, on November 15, 2006, the Board filed a notice of appeal. On June 26, 2007, the appellate court dismissed the appeal because the issue of prejudgment interest had not been resolved by the circuit court and the court's order did not contain Supreme Court Rule 304(a) language. On remand, the circuit court entered an order on September 8, 2007, awarding Kouzoukas prejudgment interest. Again, the matter was appealed and, on June 24, 2008, the appellate court affirmed the circuit court's rulings.

This court granted the Board's petition for leave to appeal on November 26, 2008. We also permitted the Retirement Board of the Firemen's Annuity and Benefit Fund of the City of Chicago to submit a brief *amicus curiae* in support of the Board on the matter of prejudgment interest.

## ANALYSIS

### Standard of Review

This cause comes before us on administrative review. See 40 ILCS 5/5—228 (West 2008) (all final decisions of the Retirement Board are subject to review under the provisions of the Administrative Review Law). Section 3—110 of the Administrative Review Law provides that in any administrative review action, review "shall extend to all questions of law and fact presented by the entire record before the court. No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court." 735 ILCS 5/3—110 (West 2006). The statute also mandates that the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3—110 (West 2006). Accordingly, it is not a court's function on administrative review to reweigh evidence or to make an independent determination of the facts. *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 244 (2009); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

The applicable standard of review depends upon whether the question is one of fact, one of law, or a mixed question of fact and law. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). Although the Board's findings of fact are given considerable deference, they are, nonetheless, subject to reversal if they are against the manifest weight of the evidence. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471-72 (2005). Questions of law, however, are reviewed *de novo*, while mixed questions of law and fact are reviewed under the clearly erroneous standard. *Outcom, Inc. v. Illinois*

*Department of Transportation*, 233 Ill. 2d 324 (2009); *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200 (2008); *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). An administrative decision is clearly erroneous where the reviewing court is left with the definite and firm conviction that a mistake has been made. *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577-78 (2005). Of course, the plaintiff in an administrative hearing bears the burden of proof and relief will be denied if the plaintiff fails to sustain that burden. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 505 (2007); *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d at 532-33.

This court has held that " 'the question of whether the evidence of record supports the Board's denial of plaintiff's application for a disability pension' " is a question of fact and, as such, the manifest weight standard of review applies. See *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d at 505, quoting *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d at 534, 543. In the case at bar, however, the Board questions whether Kouzoukas is disabled within the meaning of the Pension Code. To the extent that this issue requires us to interpret the meaning of the Code provision, it is a mixed question of law and fact, subject to the clearly erroneous standard.

Kouzoukas' Claim for Duty Disability Benefits

In the case at bar, the Board concluded that Kouzoukas was not disabled, that she could return to full active duty, and that the Chicago police department could assign Kouzoukas to "a full duty position with or without restrictions." One reason for this determination was the

Board's finding that Kouzoukas' complaints of pain were "subjective" and that she was unable to produce "any objective findings of a back, spine or SI joint injury." The Board's conclusions also rested on its findings that Kouzoukas and her physician, Dr. Yapor, lacked credibility.

The Board argues that its factual findings are not against the manifest weight of the evidence and that the lower courts erred in reversing the Board's decision because the courts reweighed the evidence and substituted their own judgments for that of the Board. The Board also contends that, because it had the opportunity to see and hear the witnesses, its credibility determinations "are not subject to review and [this] Court should decline any invitation to substitute its judgment for that of the trier of fact."

Although it is true that the Board's credibility determinations should be afforded considerable weight, they are not immune from review. As we said in *Wade*, "[e]ven under the manifest weight standard applicable in this instance, the deference we afford the administrative agency's decision is not boundless." *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d at 507. When reviewing an administrative agency's decision, we may put aside any findings which are clearly against the manifest weight of the evidence. *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125 (2009). That is the case here.

Although no medical test, X-ray or MRI scan revealed a deformity or abnormality which would explain the reason for Kouzoukas' pain, this does not mean that Kouzoukas failed to present objective evidence of her pain, nor does it mean that Kouzoukas did not prove that she is disabled. The Board's determination that Kouzoukas' pain was "subjective" and "not demonstrated by objective proof" ignores the fact that every

doctor who examined Kouzoukas believed that she was, indeed, experiencing pain. Moreover, the doctors' examinations revealed that Kouzoukas had back spasms, point tenderness, and decreased range of motion. These doctors diagnosed Kouzoukas' condition as lumbar myofasciitis and chronic lower back pain. The doctors' observations and diagnoses are, themselves, objective evidence of Kouzoukas' pain.

In denying Kouzoukas disability benefits, the Board relied heavily on the brief reports submitted by Dr. Spencer after he examined Kouzoukas in 2005. Having seen Kouzoukas only twice, Dr. Spencer opined, based on the "pristine appearance" of her MRI, that Kouzoukas' pain did not stem from "an identifiable injury to her lumbar spine" and that her pain was not "incapacitating." Of course, Dr. Spencer did not testify at the hearings and, therefore, the exact meaning of his reports could not be explored.

At the March Board hearing, the Board asked Dr. Yapor to provide his understanding of Dr. Spencer's reports. Dr. Yapor explained that Dr. Spencer had used the terms "back" and "spine" interchangeably, although he sometimes meant different things. Dr. Yapor further stated that he agreed with Dr. Spencer that Kouzoukas did not have an injury to her *spine* and that there was nothing *surgically* wrong with her back, that is, there was no injury which required the intervention of a spine surgeon such as Dr. Spencer. Dr. Yapor then stated his belief that Kouzoukas had sustained an injury to the muscles and tendons of her back, particularly at the SI joint. He did not believe this diagnosis was in conflict with Dr. Spencer's reports.

Even if we discount Dr. Yapor's interpretation of Dr. Spencer's reports, as the Board apparently did, what the Board fails to acknowledge is that even Dr. Spencer

agreed that Kouzoukas was actually experiencing pain, although he could not identify its source. Furthermore, Dr. Spencer's opinion that Kouzoukas' pain was not "incapacitating" stands alone in opposition to the opinions of the several other doctors who treated Kouzoukas since her injury on July 25, 2004.

From the outset, every medical professional who examined Kouzoukas found that she suffered pain as a result of a lower back strain that occurred on July 25, 2004, and that the pain, in turn, prevented her from returning to work as a full duty police officer. Beginning with the emergency room of Resurrection Medical Center and MercyWorks Occupational Medical Center, Kouzoukas was diagnosed as having lower back or "acute lumbar" strain due to her July 25, 2004, work-related injury, and was told that she should not return to work at that time. When her pain did not resolve, Kouzoukas was then treated for an extended period of time by Chicago police department authorized physician, Dr. Lewis, who diagnosed Kouzoukas' condition as "acute dorsal and lumbar myofasciitis"—an inflamation of the muscle and its fascia.[2] Despite many consultations with Dr. Lewis, Kouzoukas' pain still did not completely abate. Kouzoukas sometimes returned to work, at her doctor's direction, for a restricted duty assignment. But even her limited duty assignments exacerbated her back pain.

Kouzoukas was then treated by Dr. Yapor, who referred her to Dr. Konowitz for pain management. Dr. Yapor and the Board's own physician, Dr. Demorest, agreed that Kouzoukas suffered from chronic lower back pain that was neither faked nor exaggerated and which

---

[2]It is of particular note that Dr. Lewis had treated Kouzoukas in 2003 for a prior back injury and, in his expert opinion, the pain Kouzoukas was experiencing in 2004-05 was due to her July 25, 2004, injury and was unrelated to her prior injuries.

prevented Kouzoukas from returning to a full duty position in the Chicago police department.

Based on all of the evidence that was before the Board, Dr. Spencer's reports do not provide sufficient support for the Board's decision to deny Kouzoukas disability benefits. Other than Dr. Spencer, every doctor to have examined Kouzoukas believed that Kouzoukas sustained a work-related injury that resulted in a persistence of disabling lower back pain. As a result, we find the Board's determination that Kouzoukas is not disabled and can return to a full duty position to be against the manifest weight of the evidence.

We also reject the Board's finding that Dr. Yapor was not a credible witness. Our review of Dr. Yapor's testimony reveals no evasiveness or inconsistency. Moreover, the Board's own physician, Dr. Demorest, agreed with Dr. Yapor that Kouzoukas' pain was real, that she was not malingering or faking her pain, and that her pain prevented her from returning to full active duty. Although Dr. Demorest had not included in his report a finding that Kouzoukas was disabled, he testified at the hearings that he did not believe returning Kouzoukas to full duty would be appropriate or prudent.

Finally, we reject the Board's finding that Kouzoukas was not credible and that she failed to sustain her burden of proof. The overwhelming majority of the documentary evidence and expert testimony presented by Kouzoukas—including the testimony of the Board's own physician—supported her claim that she suffered from debilitating pain which prevented her return to full active duty in the Chicago police department. The fact that Kouzoukas missed some of her physical therapy sessions and took two trips within the two years after her injury does not change the fact that she presented abundant proof of her inability to perform as a full duty police officer. Therefore, we agree with the circuit and appellate courts below that

the Board's decision to deny Kouzoukas disability benefits because she could return to "a full duty position with or without restrictions" is against the manifest weight of the evidence.

## "Any Assigned Duty"

When the Board issued its decision denying Kouzoukas disability benefits, it held that Kouzoukas was not disabled and could be returned to a full duty position as an active police officer. The Board now contends that we should uphold its decision to deny Kouzoukas disability benefits—even if we find that she cannot be returned to full, active duty—because the evidence supports the finding that Kouzoukas is not disabled within the meaning of the Code.

Section 5—115 of the Illinois Pension Code (40 ILCS 5/5—115 (West 2006)) defines the term "disability" as: "A condition of physical or mental incapacity to perform *any assigned duty* or duties in the police service." (Emphasis added.) The Board argues that Kouzoukas is not disabled within the meaning of the Pension Code because she is not incapable of performing "any assigned duty." To support this contention, the Board points to Officer Schaedel's testimony that there are positions within the Chicago police department which would be able to accommodate Kouzoukas' restrictions.

Like the appellate court below, we recognize that a person, such as Kouzoukas, who cannot return to full police duties, still may not be disabled within the meaning of the Code "if a position is made available to her which can be performed by a person with her physical disability." 383 Ill. App. 3d at 952. See also *Peterson v. Board of Trustees of the Firemen's Pension Fund*, 54 Ill. 2d 260, 263-65 (1973); *Terrano v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 315 Ill. App. 3d 270, 274-75 (2000). The flaw in the Board's reasoning,

however, is that the position within the Chicago police department which Officer Schaedel testified might accommodate Kouzoukas' restrictions, was—as Officer Schaedel admitted—never actually offered to Kouzoukas. Thus, for Kouzoukas, the position proposed by Officer Schaedel was never an "assigned duty" and, therefore, there is no way to know whether Kouzoukas is qualified for and capable of performing this duty, whether the position is open and available to her, or whether the position would, in fact, accommodate Kouzoukas' restrictions.

At the hearings on Kouzoukas' application for duty disability benefits, she presented evidence that she was unable to perform "any assigned duty." In other words, Kouzoukas proved that, since her injury on July 25, 2004, whenever she returned to work and was given an assignment—whether it be full, active duty or "restricted duty"—her back pain prevented her from performing the duties assigned to her. Thus, the manifest weight of the evidence shows that Kouzoukas carried her burden of proving that she was disabled, that is, that she had a physical condition which made her incapable of performing any assigned duty and that no position within her limitations was offered to her. See *Terrano v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 315 Ill. App. 3d at 274-76 ("it is a firm offer of a limited duty position that could be performed by an individual with the applicant's physical limitations that renders the applicant not disabled within the meaning of the Code despite his inability to perform the duties of an active police officer").

The Board argues that its decision to grant or reject a claimant's application for duty disability benefits should not be dependent on the availability of an assignment in the Chicago police department within the claimant's restrictions. According to the Board, such a holding encroaches on the "exclusive original jurisdic-

tion" bestowed upon it by the Pension Code. See 40 ILCS 5/5—189 (West 2006). We disagree.

The Board has the duty under the Code to determine whether a claimant is disabled. In the case at bar, Kouzoukas presented evidence which established that she had chronic back pain which severely limited her ability to sit, stand, walk, drive, and wear a gunbelt. Moreover, because of these limitations, Kouzoukas' doctors did not provide her with a release to return to work. As a result, the Chicago police department would not reassign Kouzoukas to *any* position. Under these circumstances, Kouzoukas met her burden of proving that she was disabled. To hold otherwise would be to place Kouzoukas in an untenable "catch 22" situation—unable to work because the Chicago police department will not assign her to a position in the police service which she can perform, yet unable to obtain disability benefits.

We recognize that during the course of the hearings Kouzoukas' physical limitations were delineated and Drs. Yapor and Demorest agreed that Kouzoukas could return to work under a strictly prescribed set of restrictions. In addition, Officer Schaedel testified that there existed within the Chicago police department a position that might accommodate Kouzoukas' sitting and standing restrictions, as well as the limitations on her wearing a gunbelt. However, because the Chicago police department never actually offered Kouzoukas a position within her restrictions, the Board could not say that Kouzoukas was no longer disabled within the meaning of the Code.

In the case at bar, the Board should have granted Kouzoukas a duty disability benefit and instructed her to present herself to the Chicago police department with a doctor's release listing her restrictions as determined at the hearing. Then, if the Chicago police department offered Kouzoukas a position which accommodated the restrictions set forth in her doctor's release, she would

no longer be entitled to duty disability benefits. If, however, the Chicago police department was unable to reassign Kouzoukas to a restricted duty position within her limitations, she would remain eligible for duty disability benefits, unless she was found to be ineligible for some other reason or, as a result of a future examination, it was determined that she was no longer disabled. See *Terrano*, 315 Ill. App. 3d at 276-77 ("Under the Code, there are a number of future events that could impact the plaintiff's right to receive duty disability benefits," including attaining the age of 63 (40 ILCS 5/5—154 (West 2006)), felony conviction (40 ILCS 5/5—227 (West 2006)), refusal to be examined by a board physician (40 ILCS 5/5—157 (West 2006)), or a change in disability status is revealed after a required annual physical examination (40 ILCS 5/5—156 (West 2006))).

### Work-related

Finally, we address the Board's determination that Kouzoukas' injury was not work-related. A claimant who is found to be disabled may be awarded a duty disability benefit if the disability stemmed from a work-related incident. Otherwise, she may be awarded a nonduty disability benefit. See 40 ILCS 5/5—154, 5—155 (West 2006). In the case at bar, the Board concluded that Kouzoukas was not disabled but that, even if she was disabled, she failed to prove her July 25, 2004, injury was the cause of her disability. We find this determination by the Board to be against the manifest weight of the evidence.

Although the record shows that Dr. Spencer opined that the source of Kouzoukas' pain might be gynecological or gastrointestinal, no other doctor who treated Kouzoukas believed that her pain stemmed from something other than the July 25, 2004, work-related incident. Dr. Konowitz referred Kouzoukas for an evaluation of

her gastric infection, but that infection was never determined to be a source of Kouzoukas' pain. Again, all of the evidence and testimony, including that of the Board's physician, linked Kouzoukas' disabling pain to the July 25, 2004, back-strain injury that occurred when she was on patrol as a police officer. Therefore, the Board's conclusion that Kouzoukas' disability was not work-related is against the manifest weight of the evidence.

### Prejudgment Interest

In the case at bar, the circuit court, having found that the Board erred in denying Kouzoukas' claim for duty disability benefits, ruled that Kouzoukas was entitled to prejudgment interest pursuant to section 2 of the Interest Act (815 ILCS 205/2 (West 2006)). That section provides:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing ***."

The appellate court, relying on *Fenton v. Board of Trustees*, 203 Ill. App. 3d 714 (1990), affirmed the circuit court's ruling. The Board now challenges the award of prejudgment interest, arguing that the Interest Act is inapplicable to an award of benefits under the Pension Code and the Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago has submitted an *amicus* brief in support of the Board on this issue.

Whether prejudgment interest is available on an award of disability benefits from a public pension fund is an issue never before addressed by this court. As the Board acknowledges, our appellate court has considered the issue and there is a split of authority on the matter. *Fenton* and its progeny, *Barry v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 357 Ill. App. 3d 749 (2005), *Martino v. Police Pension Board*, 331 Ill. App. 3d

975 (2002), and *Barber v. Board of Trustees of the Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814 (1993), have held that prejudgment interest may be awarded based on their finding that a pension agreement, as prescribed by statute, is an "instrument of writing" within the meaning of the Interest Act. *Bassett v. Pekin Police Pension Board*, 362 Ill. App. 3d 235 (2005), however, rejected this holding.

As a general rule, prejudgment interest is recoverable only where authorized by the agreement of the parties or by statute. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 255 (2006). An exception exists in proceedings brought in equity. In such cases, a court may be justified in awarding interest based on equitable grounds. See *In re Estate of Wernick*, 127 Ill. 2d 61 (1989); *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 128 Ill. App. 3d 678 (1984).

It is undisputed that the Pension Code, which constitutes the written agreement between the parties, makes no provision for an award of prejudgment interest. The Code defines the term "interest" in section 5—120 (40 ILCS 5/5—120 (West 2006)), and expressly authorizes the Board to pay interest, or recover interest from a participant, in certain specific instances (40 ILCS 5/5—149, 5—164 (West 2006)). It does not, however, make provision for the payment of prejudgment interest when the Board, in good faith, denies a claim for disability benefits and that decision is later reversed on administrative review.

We note, further, that plaintiff does not suggest any purposeful wrongdoing on the part of the Board in denying her claim which would warrant an award of prejudgment interest on equitable grounds. Thus, if prejudgment interest is to be awarded, it must be because a statute authorizes it.

Kouzoukas contends, and the lower courts held, that

section 2 of the Interest Act applies to permit the payment of prejudgment interest when, pursuant to the Pension Code, disability benefits are awarded on administrative review. Although the appellate court affirmed the circuit court's award of prejudgment interest, it, like the courts in *Barber v. Board of Trustees of the Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814 (1993) (First District, fourth division), and *Martino v. Police Pension Board*, 331 Ill. App. 3d 975 (2002) (First District, sixth division), engaged in no independent analysis, but simply relied on the decision in *Fenton v. Board of Trustees*, 203 Ill. App. 3d 714 (1990).

In *Fenton*, the Fifth District of our appellate court considered, as an issue of first impression, whether a pension agreement under the Pension Code is an "instrument of writing" within the meaning of section 2 of the Interest Act and, thus, subject to an award of prejudgment interest. The court held:

> "Each of the categories of bonds, bills and promissory notes specified [in section 2] has the legal attribute of creating an indebtedness. The phrase 'or other instrument of writing' should thus be construed under *ejusdem generis* to refer only to other similar writings possessing this same legal attribute. (*Hamilton v. American Gage & Machine Corp.* (1976), 35 Ill. App. 3d 845, 853, 342 N.E.2d 758, 765.) However, the phrase 'other instruments of writing' has been construed to include building or construction contracts (*E.M. Melahn Construction Co. v. Village of Carpentersville* (1981), 100 Ill. App. 3d 544, 427 N.E.2d 181), insurance policies (*Ervin v. Sears, Roebuck & Co.* (1984), 127 Ill. App. 3d 982, 469 N.E.2d 243), real estate listing contracts (*Hammel v. Ruby* (1985), 139 Ill. App. 3d 241, 487 N.E.2d 409), and leases (*Montgomery Ward & Co. v. Wetzel* (1981), 98 Ill. App. 3d 243, 423 N.E.2d 1170). Our research has not revealed any Illinois case, however, where a pension was sought to be included under the statutory phrase 'other instruments of writing.'
>
> The police pension fund here is a statutorily mandated

creation and is administered according to legislatively prescribed terms and conditions. (See Ill. Rev. Stat. 1989, ch. 108½, par. 3—101 [now 40 ILCS 5/3—101 (West 2006)].) The terms and conditions of the pension fund are *written* in the Illinois Pension Code. Construction contracts, insurance policies, real estate listing contracts and leases are no more like bonds, bills or promissory notes than is the pension agreement, in that they all are writings creating an indebtedness. We find, therefore, that the pension agreement is an 'other instrument of writing' under the interest statute." (Emphasis in original.) *Fenton*, 203 Ill. App. 3d at 723.

It is clear from the *Fenton* court's holding that it found section 2 of the Interest Act applied to an award of benefits under the Pension Code, not because it applied the principles of *ejusdem generis* and found that the pension agreement shared similar characteristics with a bond, bill or promissory note but, rather, because it found that a pension agreement was *written* in the Pension Code and created a type of indebtedness. We reject the *Fenton* court's construction of the Interest Act and its conclusion that a public pension agreement, as provided by the Pension Code, is an "instrument of writing" within the meaning of the Act.

Statutes permitting the recovery of interest are in derogation of common law and, thus, must be strictly construed. *City of Springfield v. Allphin*, 82 Ill. 2d 571, 577 (1980); see also *Williams v. Manchester*, 228 Ill. 2d 404, 419 (2008) (statutes in derogation of common law are to be strictly construed and nothing is to be read into such statutes by intendment or implication). Section 2 of the Interest Act permits the recovery of prejudgment interest, despite the lack of express agreement of the parties, whenever moneys come due on any bonds, bills, promissory notes, or other instrument of writing. Our appellate court has long construed the term "other instrument of writing" in section 2 to include a variety

of written documents, such as contracts, leases, and insurance policies. See *New Hampshire Insurance Co. v. Hanover Insurance Co.*, 296 Ill. App. 3d 701, 708 (1998). However, bonds, bills, and promissory notes, like contracts, leases, and insurance policies, are instruments evincing transactions of a business and commercial nature which create a debtor-creditor relationship. *New Hampshire Insurance Co. v. Hanover Insurance Co.*, 296 Ill. App. 3d at 708. We agree with the court in *Bassett v. Pekin Police Pension Board*, 362 Ill. App. 3d 235, 242 (2005), that "provisions of the Pension Code have little in common with bonds, bills, promissory notes, or other instruments of indebtedness."

It is true that article III, section 5, of the 1970 Illinois Constitution provides that "membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." However, we do not interpret article III to mean that a pension agreement under the Pension Code is a contract in the traditional sense of that term. We conclude, therefore, that public pension funds do not share sufficiently similar characteristics with the instruments specified in section 2 and, thus, we find that the *Fenton* court misapplied the principles of *ejusdem generis*. We hold that public pension agreements under the Pension Code are not "other instruments of writing" within the meaning of section 2 of the Interest Act. It follows, therefore, that Kouzoukas is not entitled to prejudgment interest. Accordingly, we reverse the appellate court judgment to the extent that it affirmed the circuit court's award of prejudgment interest.

Because we find that no statute authorizes an award of prejudgment interest, we need not consider any ad-

ditional arguments proffered by the Board and the *amicus* in opposition to the award of prejudgment interest.

## CONCLUSION

For the reasons stated above, we affirm the appellate court's reversal of the Board's denial of Kouzoukas' claim for duty disability benefits. However, we reverse the award of prejudgment interest.

*Appellate court judgment affirmed in part*
*and reversed in part.*