No.  1--96--3559

KATHY F. SAMUELS, ) Appeal from the 

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

)

v. )

)

)

THE RETIREMENT BOARD OF THE POLICEMEN'S )

ANNUITY AND BENEFIT FUND, CITY OF )

CHICAGO, et al., ) Honorable 

) Thomas P. Durkin,

Defendants-Appellants. ) Judge Presiding.

JUSTICE BURKE delivered the opinion of the court:

Defendant, the Retirement Board of the Policemen's Annuity and Benefit Fund (Board), appeals from the circuit court's reversal of the Board's decision granting plaintiff Kathy Samuels, a Chicago police officer, duty disability benefits but limiting the benefits to 50% of her base salary, based on the court's determination that the Board's decision was contrary to the manifest weight of the evidence.  On appeal, the Board argues that the trial court abused its discretion in substituting its judgment for the Board's and, alternatively, that the Board's decision was not against the manifest weight of the evidence and that the Board properly interpreted the Pension Code (40 ILCS 5/5--1554 (West Supp. 1996)) in making its decision.  For the reasons set forth below, we reverse.

On December 1, 1992, Officer Samuels was on duty, when, while separating two combatants, she was injured when one of the combatants fell on her and she fell backwards and struck her head and right rear shoulder area against a door frame (on-duty injury).  At the time of this incident she felt extreme pain.  Later that evening she filed an "Injury on Duty Report."  At the completion of her duty on the morning of December 2, she received emergency medical attention at Ravenswood Hospital.  After being released from the hospital she went to see Dr. James Bransfield, the chief surgeon of the Chicago police department.  He scheduled "MRIs" (magnetic resonance imaging) for her but did not examine her.  

Dr. S. Nadimpalli, a radiologist, took MRIs of Samuels' back and head on December 4, 1992.  Dr. Nadimpalli reported that the MRI of Samuels' thoracic vertebrae revealed mild disc degeneration at T6-7 and T7-8 levels, but no herniation.  On the MRI of her cervical spine, Nadimpalli found as follows: "[p]osterior and centrally budging discs at C4-5, C5-6 and C6-7 levels.  Mild impingement on anterior surface of the spinal cord at C4-5 and C5-6 levels.  No evidence of spinal stenosis or nerve root compression." The MRI of Samuels' brain was normal.  On December 16, 1992, Samuels' supervisor entered a report of medical absence on behalf of Samuels.  

Dr. Bransfield subsequently referred Samuels to Dr. Francisco Gutierrez, an assistant professor of neurosurgery at Northwestern University Medical School.  Gutierrez wrote reports detailing his examinations and treatment of Samuels on December 16, 1992, January 28, 1993, March 15, 1993, June 16, 1993, September 2, 1993, and December 8, 1994.  During his treatment of her, Gutierrez found that Samuels' initial MRIs showed a herniated disc at C4-C5 and C5-C6 that was compressing her spinal cord and degenerative disc disease at C4-C5 and C5-C6.  According to Gutierrez, Samuels' later MRI showed "a questionable, tiny, left paramedian protruding herniated nucleus pulposis at C6-C7," which did not have "significant impression on the thecal sac or impinge on the spinal cord."  Gutierrez further found that there was no "elecromyographic evidence for radiculopathy," but that radiculopathy was not ruled out and that Samuels had limitation in her neck's range of motion.  Gutierrez concluded that Samuels' complaint of "paresthesia" in her hands was likely in part related to carpal tunnel syndrome. He recommended that Samuels receive physical therapy, a myelogram and CT scan, and finally, surgery.  

On February 3, 1993, Samuels's supervisor entered a second report of medical absence for Samuels.  On February 15, 1993 and December 28, 1994, Samuels was examined by Dr. Alan Hirsch, a neurologist. He reported his impression of Samuels' condition as “post traumatic cephalgia” and “cervical herniated nucleus pulposus.” He found that Samuels' MRIs "revealed a herniated nucleus pulposus C4-5 and C5-6 with an impingement on the spinal cord at C4-5 and C5-6 levels" and that tests revealed "delayed nerve conduction velocity in right upper extremity consistent with peripheral nerve dysfunction."  Hirsch reported that "[a]t this point in time there has been neurologic loss and intractable pain" and found that based on these results, Samuels was not able to return to police duty. Hirsch did not recommend surgery or a myelograph initially, but stated that it could be an option later.   Samuels received notice to return to work on July 23, 1993, on convalescent duty.  However, Samuels was unable to work and, on August 17, Samuels' supervisor entered a third report of medical absence.  

On July 29, 1993, Dr. Louis Pupillo, a neurosurgeon, sent a report to Dr. Bransfield regarding his examination of Samuels.  Pupillo's impressions were that Samuels had myofascial pain syndrome "superimposed" on chronic, preexisting degenerative disc disease.  He found no evidence of a herniated disc, radicular compression or spinal cord compression.  He determined that if Samuels' myofascial pain syndrome continued for more than a year, he would consider spinal fusion, but that a conservative treatment was currently appropriate.

On April 27, 1994, Dr. Bransfield sent an interoffice communication to the director of the police department's personnel division, the executive secretary of the Board and to Dr. S. David Demorest, a general practitioner who worked for the Board, in which he stated that Samuels was unable to perform unrestricted police duties because she had a central herniated disc at C5-C6 with associated cervical radiculopathy.  This memorandum showed that Samuels was to be assigned a disability pension, effective 
May 5.  On May 25, Samuels was examined by Dr. Demorest.  He concurred with Dr. Pupillo’s finding of myofascial pain syndrome and chronic, preexisting  degenerative disc disease.  Demorest wrote a report on June 9, again detailing his examination of Samuels and his review of her medical history.

On July 28, 1994, the Board held a hearing on Samuels' claim for duty disability benefits.  Samuels was represented by counsel.  Samuels described the incident during which she was injured and her physical complaints.  She testified that she never had problems with her back and was very active prior to her on-duty injury.  She stated that she was currently very limited in her activities and had a difficult time doing simple tasks.  She further stated that since her on-duty injury, the police department had sent her to four doctors:  Gutierrez, Hirsch, Pupillo, and Demorest.  She also saw a doctor in the emergency room at Ravenswood Hospital and Dr. Bransfield.  She contended that Dr. Pupillo's examination was cursory and incomplete. She disagreed with Dr. Pupillo's report which stated that she was suffering from preexisting degenerative disc disease.  She further stated that she wanted to go back to work, but did not feel able.  

The Board and Samuels' attorney discussed the fact that Samuels' normal health insurance would not cover her disability because it was work-related.  Samuels further testified that she had not seen a doctor or had physical therapy since September 1993 because her medical time had expired, she could not use her regular medical insurance because her disability was work-related and she could not afford to pay for this care herself, and she was under the impression that the police department did not want her to use her own doctor.  The hearing was then continued.

On September 22, the hearing recommenced. Dr. Pupillo testified that he examined Samuels and reviewed her MRIs.  He did not review any other medical reports.  He found that Samuels had preexisting, chronic degenerative disc disease and myofascial pain syndrome "related temporally" to her on-duty injury and that her pain was not necessarily related to her back problems.  He felt that Samuels should not work as a police officer.  He stated that Samuels' cervical herniated disc was related to her degenerative disc disease.  He did not find evidence of a cervicular radiculopathy.  He stated that if Samuels' pain did not clear up within a year, a cervical fusion operation would be discussed.  He stated that approximately 90% of people have degenerative disc disease and that it does not cause the majority of people to be disabled.  Pupillo further stated that the myofascial pain syndrome was related to Samuels' on-duty injury.  He also stated that Samuels was now disabled, but agreed that Samuels was not disabled prior to her on-duty injury and that, but for that injury, Samuels would still be able to perform her police duties. 

Dr. Bransfield testified that his diagnosis of Samuels' condition was a central herniated disk at C5-C6 with associated cervical radiculopathy.  He did not examine Samuels, but instead did a synthesis of what Drs. Nadimpalli, Gutierrez, Hirsch and Pupillo told him.  He stated that Samuels was unable to perform her police duties. 

Dr. Demorest testified that he reviewed all of the other doctors' reports.  His opinion was that Samuels' herniated disc predated her on-duty injury, but the myofascial pain syndrome was caused by that injury.  He stated that his diagnosis was similar to Dr. Pupillo's, he did not see Samuels' MRIs and that he was not qualified to interpret MRIs, and that it was his opinion that surgery and spinal fusion were unnecessary.  He further stated that 95% of his patients have degenerative disc disease and that he felt that Samuels could return to work. 

On September 22, the Board denied Samuels' claim for duty disability benefits and concluded that she could return to work.  After the Board's decision, Samuels filed a complaint for administrative review in the circuit court, but later withdrew her complaint and petitioned the Board to reappear before it to advise it of new matters, specifically the fact that the police department had subsequently refused to accept her return to active duty.  The Board granted Samuels' petition.

Prior to the second hearing, on February 13, 1995, Samuels was seen by Dr. Leonard Cerullo, a neurosurgeon.  He found that Samuels' MRIs showed mild disc degeneration at T6-T7 and T7-T8 and that there was no evidence of a herniated disc in the thoracic spine.  He also found that Samuels had bulging discs at C4-C5, C5-C6 and C6-C7 and an impingement on the  spinal cord at C4-5 and C5-6.  His examination revealed "a moderate degree of paracervical muscle spasm," "a marked limitation of range of motion in all directions," "significant cervical dysfunction with a question of right-upper rib dysfunction and pain-induced movement patterns," and that Samuels holds her head in an "antalgic position."  Dr. Cerullo concluded that Samuels was unable to return to work.

On April 17, 1995, Dr. Demorest wrote a third report in which he stated that there was no clear-cut evidence of cervical radiculopathy and that Samuels had carpal tunnel syndrome unrelated to her on-duty injury.  According to Dr. Demorest, Samuels' problems were mostly subjective complaints of pain.  He found that there was muscle spasm, but agreed with Dr. Cerullo that Samuels had "pain induced movement patterns" and that a pain management program would benefit her.  Dr. Demorest again found that Samuels did not need surgery.

On July 22, 1995, Dr. Hirsch sent a letter to Dr. Bransfield, detailing his examinations of Samuels from February 15, 1993 to June 12, 1995.  He stated that at each exam, Samuels complained of severe pain and a decreased range of motion in her neck.  As time went on, she also had dizziness accompanied by nausea and vomiting, vertigo, headaches accompanied by nausea and vomiting, vision problems, hearing problems, numbness in her arms and hands, decreased mobility and gait problems.  Hirsch concluded that Samuels had cervical radiculopathy, post-traumatic cephalgia, and bulging cervical disk with impingement on the spinal cord.  He found that her later MRI showed degenerative disc changes at C4-C5, C5-C6 and C6-C7, with stenosis of the spinal canal and deformity of the spinal cord.  The MRI also showed that the lodortic curve of Samuels' cervical spine had straightened, consistent with trauma induced spasm.  Hirsch further found that the bulging and Samuels' current condition was "related to" her on-duty injury.

On August 8, 1995, Dr. Alfred Akkeron saw Samuels for an orthopedic evaluation.  He reported that his orthopedic and neurological examination of Samuels had been normal.  Her MRIs showed degenerative disc disease. He believed that Samuels' degenerative disc disease preexisted her on-duty injury and that it had progressed over the years to her present condition.  He concluded that in all of the records, the only objective finding was of a neck muscle spasm.  He stated that none of the doctors found neurological defects.  According to Akkeron, Samuels could return to work and no longer needed physical therapy.

On August 14, 1995, Dr. Kevin McCoyd, a neurologist, sent a letter to the Board regarding his examination of Samuels and his review of her records.  He found that she had a chronic pain syndrome, disc degeneration and “some bulging.”  He also found signs of carpel tunnel syndrome.  He stated that because Samuels had no complaints prior to her on-duty injury, it was reasonable to assume that 
her problems were "secondary to the injury and may well be contributing to the pain."  He concluded that any benefit from surgery would be small.  McCoyd further stated that Samuel's ability to work was only limited due to her subjective complaints of pain.  He suggested she wear a wrist splint for carpel tunnel syndrome.

On August 30, 1995, Samuels was examined by Dr. Dennis Gates, an orthopedic surgeon.  His diagnosis was that she had a herniated disc in her cervical spine.  He recommended that she have the cervical fusion and laminectomy operation by Dr. Cerullo and that she continue to see Dr. Hirsch.

On September 1, 1995, Samuels was again sent to Dr. Cerullo.  After the examination and a review of her MRI, Cerullo found that Samuels' symptoms were "
related to" her on-duty injury and that she had exhausted her conservative options and should consider surgery.   On March 2, 1995, the medical administrator of the police department sent a letter to the Board, stating that Samuels applied for reinstatement, but was denied on the basis of findings from three examinations by Drs. Gutierrez, Hirsch and Cerullo, indicating that she had "marked limitation of motion of the cervical spine, abnormal EMG, and abnormal MRI at C6-C7" and an "indication for peripheral nerve dysfunction in the upper right extremity."  

On September 28, 1995, the Board held a second hearing on Samuels' claim for duty disability benefits.  The additional medical reports from Drs. Hirsch, Gutierrez, Cerullo, Akkeron, McCoyd, and Gates were included in the record.  Samuels testified that she had herniated discs at C4-5, C5-6 and C6-7 and saw Drs. Hirsch, Cerullo and Gates for treatment, she was scheduled for surgery, and she saw Drs. Akkeron and McCoyd at the request of the Board.  Samuels further stated that at the time of the hearing she had been out of work without pay for a year and with half-pay for five months.  She also stated that because of her financial condition she could not afford to have her doctors testify because their rates were too expensive. 

Dr. Demorest testified that he was a board certified family practitioner and that he had reviewed the reports of Drs. Cerullo, Hirsch and Gutierrez, but felt it necessary to have additional doctors, McCoyd and Akkeron, see Samuels.  Demorest's opinion was that Samuels' injuries were not a direct result of her on-duty injury.  He found that Samuels had a soft tissue problem and that there was evidence on her MRI that the condition was preexisting.  Demorest testified that a herniated disc can be caused by trauma or degenerative disc disease and that the herniated disc, by itself, does not imply a medical problem.  He stated that for a herniated disc to be a problem, the disc would be pushing on a nerve, a radiculopathy, which Samuels did not have.  He also stated that straightening of the spine can be caused by muscle spasm.  Dr. Demorest believed the herniated disc was caused by the degenerative disc disease but could not say whether or not Samuels' on-duty injury caused the herniated disc.

Dr. Akkeron testified that he was a board qualified orthopedic surgeon and that the Board had asked him to examine Samuels.  He reviewed Samuels' MRIs and the packet sent to him by the Board and found that her degenerative disc disease predated her on-duty injury.  Akkeron explained that he knew Samuels had degenerative disc disease because she had disc space narrowing and bulging.  He found no herniated discs and stated that none of the other doctors found a herniated disc.  He further stated that Samuels was capable of going back to work notwithstanding her on-duty injury, but that she could not go back to work because of the degenerative disc disease.  According to Dr. Akkeron, Samuels was disabled. 

On December 15, 1995, the Board ruled that Samuels' would receive a duty disability benefit at 50% of her base salary under the Pension Code.  The Board filed its amended order on December 28, 1995.  In its findings, the Board discussed portions of the doctors' reports and testimony which it had considered in making its decision.  They were as follows.  Gutierrez uncovered no neurological deficiencies or any evidence of cervical radiculopathy, but he found some abnormalities on Samuels' MRIs and recommended conservative treatment.  Dr. Hirsch diagnosed a diminished range of motion in Samuels' spine.  While Dr. Pupillo found some tenderness in Samuels' cervical and thoracic paraspinus muscles, "the remainder of his examination was normal noting that the abnormalities on the cervical spine were chronic."  Dr. Pupillo diagnosed Samuels with myofascial pain syndrome and chronic, preexisting degenerative disc disease.  Dr. Demorest also found that Samuels' complaints consisted mostly of myofacial pain syndrome which did not prevent her from working.  Dr. Cerullo reported a moderate degree of paracervical muscle spasm and that "[t]he remainder of his exam was apparently normal with a finding that 'Samuels' could not return to work."  Dr. Gates diagnosed a herniated disc in Samuels' cervical spine at C5-6.

The Board also made substantial findings based on Dr. Akkeron's testimony.  It discussed how he did not find a herniated disc, but did find degenerative disc disease at C4-C5 and C5-C6 which "was present at the time of [Samuels'] accident on December 1, 1992"; Dr. Akkeron testified that all of the medical reports and the MRIs referenced the degenerative disc disease; Dr. Akkeron noted that Samuels' on-duty injury could not have produced the degenerative disc disease; and Dr. Akkeron concluded Samuels could not return to work because of the degenerative disc disease. 

Based on the foregoing, the Board concluded that: (1) Samuels sustained an injury on December 1, 1992, during an act of duty; (2) Samuels' current disability, degenerative disc disease, prevented her from returning to work; and (3) Samuels' inability to return to work was a result of a physical defect, degenerative disc disease, that existed at the time her on-duty injury was sustained.  The Board concluded that Samuels' disability preceded her on-duty injury and ordered that she receive a duty disability pension in the amount of 50% of her base salary.

On February 2, 1996, Samuels filed another complaint for administrative review.  After the parties briefed the issues, the trial court heard arguments on September 13, 1996.  Thereafter, the trial court stated that the issue before it was "whether or not the record reflect[ed] that the injury [was] the result of a preexisting condition or not."  The trial court found that the evidence showed Samuels was not disabled in any way prior to her on-duty injury and had been an active person.  It further found that after the injury, Samuels' doctors diagnosed a herniated disc, and that at least one doctor recommended surgery. The trial court stated that it appeared "that the Board relied exclusively" on Dr. Akkeron's and Dr. Demorest's findings but that these findings were not sufficient to support the Board's conclusion given the testimony by the other doctors and Samuels' change from an active person to a disabled person after her on-duty injury.  The trial court then entered an order reversing the Board's decision and remanding the case to the Board.  This appeal followed.

It is well settled that "[u]nder administrative review law, judicial review of an administrative agency's decision extends to all questions of law and fact presented by the entire record and the agency's conclusions on questions of fact shall be held to be 
prima
 
facie
 true and correct.  ***  As a general rule, courts will accord deference to the interpretation placed upon a statute by the agency charged with its administration."  
Sedol Teachers Union v. IELRB
, 276 Ill. App. 3d 872, 878, 658 N.E.2d 1364 (1995).  "In reviewing the findings of an administrative agency, it is not the function of this court to resolve factual inconsistencies or to reweigh the evidence, but merely to determine whether the findings are against the manifest weight of the evidence."  
Caliendo v. Martin
, 250 Ill. App. 3d 409, 416, 620 N.E.2d 1318 (1993).  
"A decision is contrary to the manifest weight of the evidence only where the reviewing court determines, viewing the evidence in the light most favorable to the agency, that no rational trier of fact could have agreed with the agency.  ***  If there is any competent evidence supporting the agency's determination, it should be affirmed."  
Scadron v. Zoning Board of Appeals
, 264 Ill. App. 3d 946, 949, 637 N.E.2d 710 (1994).  

In the present case, the parties dispute the meaning of section 5--154 of the Pension Code (40 ILCS 5/5--154 (West Supp. 1996)).  Section 5--154 states, in pertinent part, 

"An active policeman who becomes disabled on or after the effective date 
as the result of injury incurred on or after such date in the performance of an act of duty, has a right to receive duty disability benefit during any period of such disability for which he does not have a right to receive salary, equal to 75% of his salary, as salary is defined in this Article, at the time the disability is allowed ***; provided that, 
if the disability resulted from any physical defect
 or mental disorder 
or any disease which existed at the time the injury was sustained
, *** the duty disability benefit shall be 50% of salary as defined in this Article. ***"  (Emphasis added.)

The Board construes section 5--154 to mean that if a police officer is injured while engaged in an act of duty and the injury 
exacerbates or otherwise makes active a preexisting condition and the base cause of disability is the preexisting condition, the officer is entitled to the 50% benefit level.  Samuels contends, however, that the term "resulted from" in section 5--154 implies causation, not exacerbation, and requires the Board to consider whether, "but for" the injury, Samuels' disability would not have occurred.  Samuels also argues that public policy requires that duty disability pension systems for policemen and firemen be liberally construed in favor of the pensioner.  

"In construing a statute, a court must ascertain and give effect to the legislature's intent in enacting the statute.  ***  The statutory language used by the legislature is usually the best indication of the intent of the drafters.  ***  Such language is to be given its plain or ordinary and popularly understood meaning ***."  
Collins v. Board of Trustees
, 155 Ill. 2d 103, 110-112, 610 N.E.2d 1250 (1993).  If the language of a statute is clear and unambiguous, the court must enforce it as written.  
Gabriel Builders v. Westchester Condo.
, 268 Ill. App. 3d 1065, 1068, 645 N.E.2d 453 (1994).

We find that section 5--154 is unambiguous.  We interpret the statute to provide duty disability benefits in two separate instances:  (1) where a disability occurs 
as a result
 of
 (is caused by) an on-duty injury; and (2) where a disability 
results from
 (stems from) 
a preexisting condition
 as opposed to being 
caused by the injury
.  In the first instance, the  duty disability benefit is 75% of the officer's salary.  In the second instance, where the disability "
resulted from
 any physical defect or mental disorder or any disease which existed at the time the injury was sustained," the duty disability benefit is 50% of the officer's salary.  (Emphasis added.)  The statute does not include language stating that, even if an officer has a physical defect, mental disorder or disease prior to the subsequent on-duty injury, the officer is entitled to a duty disability pension of 75% of salary if "but for" the on-duty injury the disability would not exist.  Instead, under the statute, the officer will be given a duty disability pension of 50% of his salary if
 the disability "resulted from" the preexisting condition, notwithstanding the effect the on-duty injury may have had on the preexisting condition.  We also briefly note that while Samuels argues that "it is an axiom in statutory construction that 'resulted from' implies direct causation," she cites to no authority in support of this statement and our research reveals none.  In light of our holding, we need not address Samuels' additional argument that public policy requires that duty disability pension systems for police officers be liberally construed in favor of the pensioner.  
 

The Board's remaining arguments, which overlap, are that the trial court erred in substituting its judgment for the judgment of the Board in finding that Samuels' disability was caused by her on-duty injury or, alternatively, that the Board's decision was not contrary to the manifest weight of the evidence.  Samuels argues that the trial court properly found that the Board's findings were against the weight of the evidence because the evidence overwhelmingly supported her contention that her disability was caused by her on-duty injury and the Board ignored the reports of several of the doctors in reaching its erroneous decision.  

We agree with the Board that the trial court erred in reversing the Board's decision.  Competent evidence was presented supporting the Board's determination that Samuels' disability resulted from her preexisting degenerative disc disease.  More specifically, several of the doctors found that Samuels had degenerative disc disease prior to her on-duty injury and Drs. Akkeron and Demorest found that her disability 
resulted from
 the degenerative disc disease.  Additionally, while Drs. Hirsch, Pupillo, McCoyd and Cerullo found that Samuels' disability was "related to" or "secondary to" her on-duty injury, the mere finding of a relationship between that injury and her disability does not contradict the findings of Drs. Demorest and Akkeron that her disability resulted from the degenerative disc disease.  As competent evidence was presented to support the Board's decision, in viewing the evidence in the light most favorable to the Board, we cannot say that a rational trier of fact would not have agreed with the Board's decision.  Therefore, we hold that the trial court erred in reversing the Board's decision as contrary to the manifest weight of the evidence.

Reversed.

WOLFSON, P.J., and McNAMARA, J., concur.