2018 IL App (2d) 170303
No. 2-17-0303
Opinion filed February 2, 2018

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| KATHERINE L. HADLER, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 16-MR-1375 |
| | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | |
| ILLINOIS MUNICIPAL RETIREMENT | ) | |
| FUND, | ) | Honorable |
| | ) | Paul M. Fullerton, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hutchinson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1       The plaintiff, Katherine L. Hadler, appeals from an order of the circuit court of Du Page

County affirming the decision of the defendant, the Board of Trustees of the Illinois Municipal

Retirement Fund (Board), denying her application for total and permanent disability benefits.

We reverse.

¶ 2                                    BACKGROUND

¶ 3       The plaintiff was a member of the Illinois Municipal Retirement Fund (IMRF), with over

26 years of service with employers covered by the IMRF.  Most recently, the plaintiff worked as

an engineering technician for the Village of Rantoul.  In 2012, the plaintiff began experiencing

pain in her right foot and ankle that prevented her from working. Her last day of work was November 14, 2012. On November 15, 2012, she had bunion surgery on her right foot. She was never able to return to work, and she was terminated on February 7, 2014. She applied for and received temporary disability benefits, pursuant to section 7-147 of the Illinois Pension Code (40 ILCS 5/7-147 (West 2010)), from December 2012 until the benefits expired in June 2015. Thereafter, she applied for total and permanent disability benefits pursuant to section 7-150 of the Pension Code (40 ILCS 5/7-150 (West 2014)).

¶ 4　　The record indicates the following. Following her surgery, the plaintiff continued to have significant and debilitating pain in her right foot and ankle. She underwent physical therapy and at some point received steroid injections every other day. Dr. Kimberly Eickmeier diagnosed the plaintiff with complex regional pain syndrome (CRPS) and suggested that she have follow-up surgery to remove a screw that was poking into a joint in her foot. The plaintiff received nerve blocks twice a week to help with the pain, from March through June 2013.

¶ 5　　On March 12, 2013, Dr. Frances Kramer confirmed the diagnosis of CRPS. Follow-up surgery to remove the screw from the plaintiff's right foot occurred on April 18, 2013. Her pain continued. On July 17, 2013, the plaintiff had a spinal cord stimulator implanted in an attempt to alleviate her pain, but the stimulator was removed about a week later because it made her pain worse. In September 2013, Dr. Ramsin Benyamin and Dr. William Pierce both confirmed the diagnosis of CRPS. The plaintiff had other follow-up surgeries in October 2013, but her pain did not subside.

¶ 6　　On February 7, 2014, a neurological report was issued by Dr. Elliot Palmer and reviewed by Dr. Brett R. Stacey, of the Comprehensive Pain Center. Dr. Palmer noted that the nerve blocks did not relieve the plaintiff's pain. A neurological exam indicated that the plaintiff was alert and oriented to person, place, and time. Dr. Stacey's progress report notes indicated that the

plaintiff's gait and station were "essentially symmetric, toe gait normal, heel gait normal, steady, squat and rise and stand each foot." He also indicated that "straight leg raise sitting is full and nonrestricted."

¶ 7    On November 14, 2013, Dr. Pierce completed an IMRF physician's statement that indicated that the plaintiff should not return to work. On January 17, 2014, Dr. Pierce prepared another IMRF report that stated that the plaintiff was unimproved, with burning-type pain consistent with CRPS of the right foot. Dr. Pierce indicated that the plaintiff was indefinitely temporarily disabled.

¶ 8    The plaintiff had several follow-up visits with Dr. Kramer. On a May 22, 2015, physician questionnaire, Dr. Kramer noted that the plaintiff suffered from CRPS in her right foot. She could not walk or stand for longer than a few minutes and could not bear weight on her foot for more than 30 seconds. She used a wheelchair intermittently. Her pain doctor had instructed her not to drive. Her pain and her medications clouded her senses. The pain had been excruciating and continuous for two years. Walking aggravated the pain. Dr. Kramer recommended a restriction of "zero hours" of walking per day. He opined that she would never be able to return to work and could never perform any gainful activity. Dr. Kramer concluded:

> "[The plaintiff] has had multiple right foot surgeries. These have left her with severe debilitating pain, inability to walk or stand for more than a few minutes. She has tried numerous medication modalities, and procedures. She has extreme sensitivity to touch, pressure and temperature. Her complex regional pain syndrome has totally disrupted her life and employment. She is unable to work."

¶ 9    On June 2, 2015, Dr. Heather O'Brien, the plaintiff's treating psychologist, also completed a physician questionnaire. Dr. O'Brien indicated that the plaintiff could not wear shoes, could not stand for more than brief periods, and could not walk more than a few steps at

once. Her medications impacted her cognitive abilities, including concentration, organization, and memory. Dr. O'Brien also indicated that the plaintiff was able to drive but that her medications sometimes made it difficult. Dr. O'Brien opined that, due to the plaintiff's symptoms, vocational rehabilitation would likely not be effective. In order for the plaintiff to work, her pain issue would have to be resolved and her pain medications decreased and there would have to be improvements in attention, memory, and concentration. Dr. O'Brien opined that the plaintiff could not maintain a work pace appropriate to a given workload, because it took the plaintiff significantly longer to process tasks and she was easily confused. The plaintiff was unable to perform complex or varied tasks. To a question regarding whether the plaintiff would be able to return to work, Dr. O'Brien responded that CRPS generally does not have a positive treatment outcome.

¶ 10    On May 30, 2013, Dr. Stuart King, one of the plaintiff's treating physicians, completed an IMRF report that indicated that the plaintiff was temporarily disabled. He issued similar reports in June 2013, July 2013, November 2013, April 2014, May 2014, July 2014, and November 2014. On November 6, 2013, Dr. King recommended that the plaintiff stop working. On July 24 and November 7, 2014, Dr. King's reports indicated that the plaintiff's foot was painful and sensitive to air and touch. The plaintiff was unable to wear a sock or shoe and was unable to sit, stand, or walk. On February 6 and March 3, 2015, Dr. King issued reports that indicated the same.

¶ 11    On May 13, 2015, Dr. King found that the plaintiff was totally and permanently disabled due to her CRPS. She had chronic daily pain in her foot, her foot was sensitive to air and touch, she was unable to wear socks or shoes, and she could not stand or walk for any extended time. In an undated report, Dr. King noted that the plaintiff's pain was exacerbated by movement and that it continually interfered with her attention and concentration. He opined that the plaintiff

could not (1) think clearly; (2) sit, stand, or walk more than 15 minutes at a time; (3) wear shoes; or (4) work an eight-hour day. Dr. King found that the plaintiff would need to continually shift her physical position, would need to lie down at unpredictable intervals during a work shift, and would be absent from work more than three times a month. Further, prolonged sitting would require the plaintiff's legs to be elevated. She could not drive due to her medications and inability to use her right foot. On March 29, 2016, Dr. King filled out an IMRF form related to the benefit claim. He noted that he could not complete the physical-capacity evaluation, because he did not perform fitness-for-work evaluations. He did note that the plaintiff could not stand, walk, or drive, but he did not indicate any limitation as to sitting.

¶ 12    In deciding whether the plaintiff was permanently disabled, the Board relied on findings made by Dr. Noel Rao, IMRF's medical consultant. In a letter dated June 20, 2015, Dr. Rao stated that he had reviewed all of the plaintiff's medical records. Dr. Rao noted that, in a questionnaire, the plaintiff indicated that she had severe pain in her right foot and could not wear shoes. The pain was worsened by sitting, standing, and walking. She also had anxiety and high blood pressure and was on medications that impeded her ability to think and her memory. She could not drive because of her medications and her inability to use her right foot. Dr. Rao also reviewed medical records from Dr. King. Dr. Rao noted that, in the May 13, 2015, physician's statement, Dr. King opined that the plaintiff was permanently disabled due to the chronic daily pain in her foot. Dr. Rao also noted that, on the May 22, 2015, questionnaire, Dr. Kramer noted that the plaintiff occasionally used a wheelchair, was unable to walk more than 10 feet, and was advised not to drive by her pain physician.

¶ 13    Dr. Rao further noted that he had reviewed Dr. O'Brien's June 2, 2015, questionnaire. Dr. Rao noted that Dr. O'Brien (1) stated that the plaintiff could drive but that her medications sometimes made it challenging and (2) opined that the plaintiff would not be able to maintain an

appropriate pace for a given workload and could not perform complex or varied tasks. Dr. Rao also stated that he had reviewed his own records concerning the problems with the plaintiff's right foot and her subsequent surgeries. Dr. Rao opined that the plaintiff had impairments confined to her right foot and could not stand or and walk for prolonged periods. However, Dr. Rao concluded that the plaintiff could engage in some gainful activity and therefore was not eligible for total and permanent disability benefits. On July 1, 2015, in light of Dr. Rao's report, the Board denied the plaintiff's request for benefits.

¶ 14 On September 1, 2015, the plaintiff sent the IMRF a request to review the denial of her claim for benefits. On August 25, 2016, a hearing was held before the Board's benefit review committee (Committee). The IMRF had requested additional evidence from the plaintiff, including medical records from Dr. King. The plaintiff also provided additional medical evidence and documents related to her claims for Social Security disability benefits, including the decision of the administrative law judge (ALJ) granting those benefits. Additionally, the IMRF referred the plaintiff's claim to Allegiant Managed Care (Allegiant) for a vocational opinion on whether the plaintiff was able to engage in "any gainful activity" (see 40 ILCS 5/7-150(a)(1) (West 2014)).

¶ 15 On August 17, 2016, a case manager for Allegiant issued a report. In the report, the case manager noted that the "opinion provided in the report [was] based on review of the available record, completion of a transferable skills analysis and Labor Market Survey, and research regarding median wages associated with identified positions. That is to say, no meeting was conducted with [the plaintiff] in person or by phone." The case manager noted that Dr. Kramer opined that the plaintiff could not stand or walk. Dr. O'Brien found that the plaintiff was unable to wear shoes and could not walk more than a few steps and that her medications impacted her cognitive abilities. Dr. King opined that the plaintiff could sit only 10 to 15 minutes at one time,

could stand or walk less than 10 to 15 minutes at one time, required a job that permitted her to shift her position frequently, and could not drive due to her medications and inability to use her right foot. The case manager stated that she conducted a transferable-skills analysis to determine what skills, abilities, and other worker characteristics the plaintiff could apply to new or similar occupations. The case manager noted that, "[f]or purposes of this report, it was assumed that [the plaintiff] [was] capable of working in a position requiring no more than the sedentary physical demand level." The case manager also noted that she considered the plaintiff's physical limitations as defined by Dr. King. The case manager concluded that there were jobs available at the sedentary-physical-demand level that the plaintiff could perform.

¶ 16    In the ALJ's October 2015 report, ultimately granting the plaintiff Social Security disability benefits, he noted that the plaintiff had "mild restriction in activities of daily living, moderate difficulties in maintaining social function, moderate difficulties in maintaining concentration, persistence or pace." The ALJ noted that the plaintiff had the residual functional capacity to perform sedentary work but could not climb ladders, ropes, or scaffolds and could perform only simple repetitive tasks. The ALJ also found that the plaintiff could stay on task less than 80% of the time due to her chronic pain and would likely have excessive work absences. The ALJ noted that several medical providers had opined that the plaintiff could not function in a competitive work environment and that the medical evidence supported that finding. Finally, the ALJ found that the medical evidence supported the plaintiff's subjective allegations about the severity of her limitations and that the medical evidence demonstrated ongoing aggressive treatment for her foot condition. The ALJ stated that he gave more weight to the plaintiff's treating physicians' opinions that she could not function in a competitive work environment than to Dr. Rao's physical assessment, because the evidence showed that the plaintiff was more limited than Dr. Rao had determined. The ALJ concluded that, because the

plaintiff's limitations so narrowed the range of work that she could perform, a finding of permanent disability was appropriate.

¶ 17    In a May 26, 2016, report, Dr. Rao noted that he had reviewed the additional medical evidence that was sent to him.  He noted that, in a February 10, 2016, questionnaire, the plaintiff indicated that she had CRPS in both feet but that it was worse on the right.  Her medications affected her ability to think, sleep, and drive.  She could do light household chores, but only a little each day.  She could stand for only a short time.  Dr. Rao noted that he had reviewed the ALJ's report.  Dr. Rao noted that the plaintiff was taking antidepressants for pain but was not under the care of a psychiatrist.  Dr. Rao concluded that the review of the additional evidence did not alter his previous opinion that the plaintiff was ineligible for total and permanent disability benefits, because she could engage in some gainful activity.

¶ 18    On August 25, 2016, following a telephone hearing, the Committee recommended upholding the decision to deny the plaintiff's claim.  The minutes from the Committee hearing indicate that the Committee heard comments from Dr. Rao, read the Allegiant report, and reviewed the information packet submitted by staff prior to the hearing.  The Committee determined that, "[a]fter reviewing the medical, education and work experience records in our files, it is the opinion of IMRF that [the plaintiff's] claimed conditions do not prevent her from being able to perform gainful activity."  Accordingly, the Committee determined that she did not meet the statutory eligibility requirements for total and permanent disability benefits.

¶ 19    On August 26, 2016, the Board agreed with the Committee's recommendation.  The Board issued a letter on September 21, 2016, explaining its reasons for the denial of benefits. The Board explained that its determination was based on section 7-150 of the Pension Code and the fact that, based on the medical evidence, the plaintiff was not "unable to engage in *any gainful activity* because of any medically determinable physical or mental impairment."

(Emphasis added.) 40 ILCS 5/7-150 (West 2016). The Board explained that "[t]otal and permanent disability benefits can be awarded only if it is demonstrated that [the] disability is total and permanent for *any* type of work." (Emphasis in original.) The Board found that the plaintiff did not meet this requirement.

¶ 20 On January 24, 2017, the plaintiff filed an action in the trial court for administrative review of the Board's decision, pursuant to the Administrative Review Law (735 ILCS 5/3-101 *et seq*. (West 2016)). On April 3, 2017, the trial court affirmed the Board's decision. The trial court found that the medical evidence indicated that the plaintiff could sit for extended periods of time and that there were sedentary occupations available for which she was qualified. The trial court further noted that the two doctors who indicated that the plaintiff could not work did not state that she had problems remaining in a seated or sedentary position. Although Dr. King stated that the plaintiff was totally disabled, the trial court noted that his most recent questionnaire (by placing no explicit limits on sitting) indicated that the plaintiff could sit for extended periods of time. Finally, the trial court acknowledged that the vocational report was based on the assumption that the plaintiff could perform sedentary work. The trial court found that this was not improper, because Dr. Rao had found, three months prior to the completion of that report, that the plaintiff could remain in a sedentary position without pain and could find gainful employment. The trial court found that the Board's determination, denying the plaintiff's claim for total and permanent disability benefits, was not clearly erroneous. The plaintiff filed a timely notice of appeal.

¶ 21                                    ANALYSIS

¶ 22 On appeal, the plaintiff argues that the Board erred in denying her claim for total and permanent disability benefits, because she is unable to engage in any gainful activity within the meaning of section 7-150 of the Pension Code.

¶ 23    In reviewing a decision by an administrative agency, we must review the final decision of that agency.  Thus, in this case we review the decision of the Board, not the decision of the trial court.  *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 819 (2009). We apply different standards of review depending on the type of issue for which review is sought. When we review factual findings of the Board, we deem those findings *prima facie* correct and will reverse only if they are against the manifest weight of the evidence.  *Id.* (citing *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 513 (1985)).    When the issue is the correctness of the agency's conclusions of law, our review is *de novo*.  *Id.*  Finally, when the issue is a mixed question of fact and law, we apply the "clearly erroneous" standard and will reverse only if our review of the record and the agency's determination leaves us with the "definite and firm conviction" that a mistake has been made.  (Internal quotation marks omitted.) *Id.* at 820 (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001)).

¶ 24    In the present case, the issue is whether the plaintiff is disabled within the meaning of the Pension Code.  This is arguably a mixed question of fact and law, subject to the "clearly erroneous" standard.  *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009).  However, the parties do not dispute the meaning of the term "gainful activity."  Rather, the parties essentially dispute whether the facts support the Board's determination that the plaintiff is able to engage in any gainful activity.  This is a question of fact, subject to the manifest-weight standard.  *Sudzus*, 393 Ill. App. 3d at 819.  Under the manifest-weight standard, we will overturn a decision only if, after reviewing the evidence in the light most favorable to the Board, we determine that no rational trier of fact could have agreed with the conclusion reached by the Board.  *Samuels v. Retirement Board of the Policemen's*

*Annuity & Benefit Fund*, 289 Ill. App. 3d 651, 660 (1997).  Although we apply the manifest-weight standard, we note that our resolution of this case would be the same under either standard.

¶ 25    Section 7-150 of the Pension Code provides:

"(a) A participating employee shall be considered totally and permanently disabled if:

1. He is unable to engage in any gainful activity because of any medically determinable physical or mental impairment which can be expected to result in death or be of a long continued and indefinite duration, *** [and]

2. The Board has received a written certification by at least 1 licensed and practicing physician stating that the employee meets the qualifications of subparagraph 1 of this paragraph (a)."  40 ILCS 5/7-150(a) (West 2016).

¶ 26    In this case, the only issue is whether the plaintiff's disability rendered her "unable to engage in any gainful activity."  The term "gainful activity" is not defined in the Pension Code. The parties do not dispute that the Board, pursuant to its rulemaking authority under section 7-198 of the Pension Code (40 ILCS 5/7-198 (West 2016)), adopted resolution 2016-02-08, which defines "gainful activity" under section 7-150 of the Pension Code as follows:

"[G]ainful activity for purposes of Section 7-150 of the Illinois Pension Code shall mean whether the applicant, at the time of his or her application for total and permanent disability, is capable of obtaining potential employment in any occupation or position under which the applicant has the ability to earn at a minimum the monthly Social Security gainful work activity earnings limitation.  In making this gainful activity determination, consideration shall be given to an applicant's education and work

experience although the determination of whether an applicant is able to engage in gainful activity is not limited to employment in the field where the applicant had previously worked, studied or trained. In addition, in making this gainful activity determination, the geographic availability of gainful activity shall not be considered. In certain cases, at the discretion of IMRF, a vocational expert may be used to make the determination of whether an applicant is unable to engage in any gainful activity as herein defined ***." Illinois Municipal Retirement Fund Board Resolution No. 2016-02-08 (approved Feb. 26, 2016). http://www.imrf.org/en/about-imrf/board-resolutions/disability%20benefits/br-2016-02-08.

¶ 27 Upon our review of the record here, we hold that the Board's determination was against the manifest weight of the evidence. The plaintiff's medical records document ongoing and aggressive treatment for her CRPS. Despite her hospitalizations, physical therapy, nerve blocks, and pain medications, the plaintiff continued to experience significant symptoms. Of the plaintiff's treating physicians who rendered opinions, all determined that the plaintiff was permanently disabled. Dr. Kramer opined that the plaintiff would never be able to return to work or perform any gainful activity. Dr. Kramer noted that the plaintiff's pain was excruciating and continuous, that her pain medications clouded her senses, and that she could not walk or stand for more than a few minutes.

¶ 28 Dr. King concluded in May 2015 that the plaintiff was totally disabled due to her CRPS. Dr. King noted that the plaintiff had chronic pain in her foot and that it continually interfered with her ability to concentrate. If the plaintiff worked, she would need to continually shift her position, would need to lie down at unpredictable intervals, and would be absent more than three times a month. Dr. King also noted that the plaintiff was unable to drive due to her pain medications and inability to use her right foot.

¶ 29    Finally, Dr. O'Brien opined that vocational rehabilitation would likely not be effective. Dr. O'Brien opined that the plaintiff would be unable to return to work unless her pain issues were resolved and she was taken off pain medications. Dr. O'Brien also opined that the plaintiff would not be able to function in a competitive work environment, because the plaintiff could not perform complex or varied tasks and was easily confused.

¶ 30    In rendering its determination, the Board relied exclusively on Dr. Rao's opinions and on the Allegiant report. However, Dr. Rao never treated the plaintiff. We acknowledge that the Board was not required to give more weight to the opinions of the plaintiff's treating physicians (*Prairie Farms Dairy v. Industrial Comm'n*, 279 Ill. App. 3d 546, 550-51 (1996)), but Dr. Rao never explained the basis for his opinions. In his June 2015 report, Dr. Rao stated that he reviewed all the medical evidence but then stated only that the plaintiff could not stand or walk for prolonged periods. Dr. Rao did not address her chronic pain, the fact that her pain medications clouded her senses, or her need to continually shift her position, elevate her foot, and lie down at unpredictable intervals. Similarly, in his May 2016 report, Dr. Rao again stated that he reviewed all the medical evidence, but he offered no explanation as to how, with all the limitations set forth by the plaintiff's treating physicians, the plaintiff could perform any gainful activity. Further, he offered no reasons why the plaintiff's treating physicians' opinions should be discounted.

¶ 31    The Allegiant report is also insufficient to support the Board's determination. In the report, the case manager stated that she "assumed" that the plaintiff could perform sedentary work. However, the case manager also stated that she never directly spoke with the plaintiff. The Board argues that the assumption that the plaintiff could perform sedentary work was based on the opinion of Dr. Rao. However, there is no indication in the report that the case manager reviewed Dr. Rao's opinions or spoke with him. The report is also insufficient because the

plaintiff's work limitations were not all considered. In the report, the case manager stated that she considered the limitations set forth by Dr. King and she included a list of limitations. However, several limitations were missing from the report, such as the plaintiff's attention and concentration issues, her need to lie down at unpredictable intervals, her need to have her feet elevated for prolonged sitting, and the fact that she would likely be absent from work more than three times per month.

¶ 32    In support of its determination, the Board cites Dr. King's March 29, 2016, IMRF questionnaire. On that questionnaire, Dr. King indicated that he did not perform fitness-for-work evaluations. Additionally, although he indicated that the plaintiff could not stand, walk, or drive, he did not indicate any limitation as to sitting. However, the fact that Dr. King did not list a limitation as to sitting cannot be interpreted as an affirmation that the plaintiff had no limitation as to sitting, especially in light of Dr. King's repeated assertions in other reports that the plaintiff could not sit for more than 10 to 15 minutes at a time. The Board also argues that the plaintiff's own attorney stated that the plaintiff could perform sedentary occupations. However, the plaintiff's attorney actually stated that "[t]here are essentially no occupations that exist in the current economy at the light or sedentary level that the [plaintiff] would be able to perform."

¶ 33    Additionally, the Board cites the plaintiff's outpatient physical-therapy notes, which list the plaintiff's functional limitations as "standing, ambulation, stairs, bending, lifting, [and] squatting." However, these notes were from January, February, and March 2013, shortly after the plaintiff's surgery, and cannot be used to counteract the most recent findings of the plaintiff's treating physicians. Finally, the Board cites Dr. Stacey's neurological exam of the plaintiff, which stated that "sitting is full and nonrestricted." However, this was regarding her ability to perform a straight-leg raise while she was sitting. It was not a determination that she could sit for unlimited periods of time. -

¶ 34    The Board argues that, "[i]f the record contains evidence to support the IMRF decision, it must be affirmed." Although the record does contain evidence that would purportedly sustain the Board's decision, that evidence lacks a reliable basis and, upon consideration of all the evidence, the opposite conclusion is clearly evident. *Soto v. Board of Fire & Police Commissioners*, 2013 IL App (2d) 120677, ¶ 22. The Board relies on *Saldana v. Industrial Commission*, 53 Ill. 2d 222 (1972), for the proposition that the choice between conflicting views of experts is for the agency charged with making factual determinations. However, in *Saldana*, the choice was between two "eminently qualified experts," each of whom had examined the employee. *Id.* at 222. In the present case, the plaintiff offered opinions from three experts. All of her experts had examined and treated her. The Board rejected those opinions and instead relied upon the opinions of the Allegiant case manager and Dr. Rao, neither of whom had ever met the plaintiff. It is undisputed that the plaintiff is in constant pain and is unable to sit, stand, or walk for any extended period. Although we may not reweigh the evidence, we have an obligation to determine whether the Board's decision was "just and reasonable in light of the evidence presented." *Murbach v. Anderson*, 96 Ill. App. 3d 1015, 1018 (1981) (quoting *Davern v. Civil Service Comm'n*, 47 Ill. 2d 469, 471 (1970)). The Board's decision was against the manifest weight of the evidence.[1] Even applying the "clearly erroneous" standard, we are left with a definite and firm conviction that the Board's decision was a mistake.

---

[1] We note that an employee who is drawing total permanent disability benefits is subject to periodic checks, including an examination by a physician, to determine whether he or she remains totally and permanently disabled. 40 ILCS 5/7-153 (West 2016); see also Ill. Mun. Ret. Fund, Manual for Authorized Agents § 5.40A(2)(c) (Jan. 2014), https://imrf.org/AAmanual/Online_AA_Manual/aamanual.htm (noting that total permanent disability benefits may be

¶ 35                              CONCLUSION

¶ 36    For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County and reverse the Board's decision.

¶ 37    Reversed.

terminated if the member refuses to submit to a physical examination requested by the IMRF).