2023 IL App (1st) 211432-U

No. 1-21-1432

Order filed May 1, 2023.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| MARIAN VALKOV, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CH 2602 |
| | ) | |
| CITY OF NORTHLAKE POLICE | ) | |
| PENSION FUND and THE BOARD OF | ) | |
| TRUSTEES OF THE NORTHLAKE | ) | |
| POLICE PENSION FUND, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | The Honorable |
| (City of Northlake and The Board of Trustees of the | ) | Alison C. Conlon, |
| Northlake Police Pension Fund, Defendant-Appellees). | ) | Judge Presiding. |

PRESIDING JUSTICE LAVIN delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's judgments that (1) confirmed the final administrative decision of the pension fund board that plaintiff was not disabled when it was not against the manifest weight of the evidence, and (2) denied plaintiff's motion to

supplement the administrative record or, in the alternative, to remand the cause to the administrative body for consideration of additional evidence.

¶ 2     Plaintiff Marian Valkov appeals from a judgment of the circuit court of Cook County, which confirmed the final administrative decision of the Board of Trustees of the Northlake Police Pension Fund (Board), finding that he was not disabled and denying him a disability pension. On appeal, he contends that the Board erred when it credited the opinion of the one doctor who opined he was not disabled although "all" other opinions found him disabled. He further contends that the circuit court erred by denying his motion to supplement the administrative record, or in the alternative, to remand the cause to the Board after the "discovery" that approximately 150 pages of his physical therapy records were omitted from the administrative record. We affirm.

¶ 3     The following facts are gleaned from the administrative record, which contains plaintiff's medical and physical therapy records, his pension application, and transcripts from the Board's hearings on January 24, September 19, and December 11, 2019.

¶ 4     Plaintiff was hired as an officer by the Northlake Police Department in 2007, and was later assigned to the detective division. On the morning of July 14, 2017, plaintiff was involved in a vehicle accident and taken to a hospital. Emergency department records state that plaintiff was a "restrained driver" in a moderate speed front-end motor vehicle accident in which the airbag did not deploy. Although plaintiff did not suffer a head injury or lose consciousness, he had "mild persistent mid thoracic back pain." Later that day, after being released from the hospital, he was examined by Dr. Kathryn Mencel.[1] Dr. Mencel diagnosed injuries to the neck and right shoulder, referred plaintiff for physical therapy, and excused him from work until July 24, 2017.

---

[1] Dr. Mencel's first name is also spelled Katarzyna in the record.

¶ 5     On July 17, 2017, plaintiff underwent an initial evaluation at Athletico Physical Therapy (Athletico). The evaluation stated that plaintiff had impaired neck and shoulder motion, strength limitations, and high pain, and recommended physical therapy three times a week for six weeks.

¶ 6     Dr. Mencel referred plaintiff to Dr. Ryon Hennessy. At an office visit on October 16, 2017, Dr. Hennessy noted that if physical therapy failed, plaintiff might require a two-level cervical fusion. During an office visit on January 29, 2018, Dr. Hennessy noted that plaintiff exhibited "mild" improvement with physical therapy, but had difficulty rotating his head to the left.

¶ 7     Plaintiff was also examined by Dr. Harel Deutsch. In a March 9, 2018, letter, Dr. Deutsch stated that plaintiff reported neck pain and tingling in both legs. The cervical examination indicated neck rotation to 50 degrees in either direction with "some guarding" and no tenderness to light palpitation in the neck and upper back. Dr. Deutsch opined that plaintiff's physical therapy regime was not appropriate, as he showed no improvement. Rather, plaintiff was a candidate for an anterior cervical discectomy and fusion, and could return to "light" duty after six weeks and full duty after six months. If plaintiff did not have surgery, he was at maximum medical improvement (MMI), would not benefit from further physical therapy, and could work without restrictions.

¶ 8     On May 11, 2018, plaintiff met with Dr. Ashraf Darwish, who examined him and recommended a C5-6 and C6-7 anterior cervical diskectomy and fusion.

¶ 9     On May 14, 2018, plaintiff filed an application for disability benefits with the Northlake Police Pension Fund, stating that he had a cervical spine injury and seeking both line-of-duty and not-on-duty disability pensions.

¶ 10     On June 11, 2018, plaintiff underwent fusion surgery at C5-6 and C6-7, performed by Dr. Hennessy and Dr. Darwish.

¶ 11     On July 12, 2018, Dr. Hennessy noted that the pain in plaintiff's left shoulder had resolved, and he was not taking pain medication. On August 17, 2018, plaintiff had some neck stiffness but no numbness, tingling, or weakness; motion in the cervical spine was 60 degrees to the right and left, with "almost full" extension. At an office visit on October 19, 2018, plaintiff denied numbness, tingling, or weakness in the upper extremities and had no pain when sitting straight, but felt pain if he turned to the left and expressed that he was not ready to resume contact with suspects. Dr. Hennessy recommended one month of physical therapy followed by one month of work conditioning, and opined if the fusion were solid and plaintiff's symptoms continued to improve, he "might likely return *** to full duty without restrictions."

¶ 12     A July 18, 2018, Athletico evaluation revealed "severe" limitation in cervical mobility, and that plaintiff complained of midline cervical pain with any head movement or tensing of shoulders. On August 28, 2018, plaintiff reported that his neck felt much better, and on September 4, 2018, he reported he felt "better every day." On October 2, 2018, plaintiff reported that he had more overall mobility, but that sudden movements still caused discomfort.

¶ 13     On November 23, 2018, plaintiff underwent a functional capacity evaluation (FCE) at Athletico, which concluded that he met 11 of 21 job demands (52.38%) for a police officer. A second FCE on December 5, 2018, concluded that he met 19 of 21 job demands (90.48%). On December 19, 2018, plaintiff underwent a third FCE, which concluded that he met 20 of 21 of job demands (95.24%) and recommended discharge. The report concluded that plaintiff could perform lifting and carrying tasks, tolerated prolonged standing and walking, and had no limitations with reaching, bending, squatting, crawling, and kneeling. Plaintiff had made "good progress," but exhibited "guarded cervical rotation during exercises and functional tasks." His ability to drive in

emergency situations was limited due to his range of motion and back pain, and he voiced concerns about returning to emergency situations where rapid motion of the c-spine was required.[2]

¶ 14    On December 21, 2018, Dr. Hennessy reviewed the FCE and a CT scan of plaintiff's cervical spine, and opined that the "fusions were solid at both levels," alignment and cervical lordosis were also proper, and there was no sharp kyphosis or lordosis. However, the decreased motion in plaintiff's neck made him "vulnerable" when wrestling with suspects and caused him difficulty using firearms. Dr. Hennessy concluded that plaintiff had reached MMI and released him to work with "permanent restrictions" as stated in the December 19, 2018, FCE report, which included "office/desk work only, no lifting greater than twenty-five pounds, [and] no prisoner/suspect contact."

¶ 15    On August 28, 2018, the City of Northlake (City) filed a petition to intervene in the pension hearing process to contest plaintiff's eligibility for a line-of-duty pension. Following arguments on January 24, 2019, the Board granted the City's petition.

¶ 16    On March 4, 2019, plaintiff met Dr. Julie Wehner for an independent medical examination (IME). Plaintiff related that turning to the right or left rated at 7 or 8 on a 10-point pain scale, and that he could lift 35 to 40 pounds, had difficulty running, and did not take pain medication. During a clinical examination, plaintiff's neck flexion was normal and although side rotation to the left and right was 30 degrees, he turned his body. After meeting with plaintiff and examining the medical and physical therapy records provided, Dr. Wehner noted that although plaintiff

---

[2]There is no indication in the record that the Athletico evaluations included an in-vehicle assessment of plaintiff's driving ability.

complained of pain while moving his head and had "limitations with driving due to deficits in turning his neck," he had been able to complete 98% of his job duties after work conditioning.

¶ 17    Dr. Wehner concluded that plaintiff was disabled from performing the full and unrestricted duties of a police officer. Dr. Wehner acknowledged, however, that the only precluding condition was his inability to drive in an "unrestricted fashion." She noted that plaintiff was only nine-months postoperative and would continue to improve for up to a year. Although plaintiff reported that his pain escalated with high activity, this was not documented in the work conditioning program as he fulfilled almost all of the job duties. Dr. Wehner opined that plaintiff was "exceptionally close" to obtaining full release and with self-motivated exercise and physical therapy, his range of motion "should improve over the next several months and allow him to return to *** full duty."

¶ 18    On March 13, 2019, plaintiff met with Dr. Babak Lami, a board-certified orthopedic spinal surgeon, for a second IME. Dr. Lami spent 15 to 20 minutes interviewing and physically examining plaintiff and 50 minutes examining his medical records. Dr. Lami did not ask plaintiff to "perform any maneuvers during the examination which may cause him pain or discomfort." Plaintiff related that although surgery helped, he developed stiffness postoperatively and was unable to move his neck. A physical examination revealed limited flexion and extension of the neck with 20 degrees of rotation to the left and 10 degrees of rotation to the right. After reviewing plaintiff's medical records, Dr. Lami noted that plaintiff underwent an "unremarkable" and "uncomplicated" two-level spinal fusion, that a postoperative CAT scan did not show any complications, and that Dr. Hennessy stated that the fusion was "solidly healed." Dr. Lami opined that plaintiff could return to work at "full" and "unrestricted" duty.

¶ 19    On April 1, 2019, plaintiff met with Dr. Wellington Hsu for the third IME. During the meeting, plaintiff stated that while his symptoms improved and he took no medication, he had "some" decreased range of motion and mild pain in his neck. Dr. Hsu noted 80 degrees of left and right lateral rotation, 40 degrees of flexion, 10 degrees of extension, 30 degrees of left rotation, and 60 degrees of right lateral rotation. Dr. Hus diagnosed plaintiff with (1) cervical disc herniation status post C5-C7 anterior cervical discectomy and fusion, and (2) cervical spondylosis. Dr. Hsu concurred with Dr. Hennessy's conclusion that plaintiff could likely perform most of the duties of a police officer, with no lifting over 25 pounds and occasional overhead lifting. However, there were "extreme situations" which would require a full range of motion of the cervical spine. Dr. Hsu therefore concluded that plaintiff suffered from a disabling cervical spine injury which led to a two-level cervical fusion and a decreased range of motion in the cervical spine.

¶ 20    On August 2, 2019, the evidence deposition of Dr. Lami was held. Dr. Lami testified that he conducted four or five pension disability evaluations a year, and charged $1200 for document review, an examination, and a report. He also maintained an orthopedic practice, concentrated in spinal surgery, and had performed the two-level cervical fusion plaintiff underwent hundreds of times. He did not have "much use" for an FCE, but would order one if requested. Dr. Lami characterized the FCE as not a "validated test" because it is a subjective report of pain and ability by the examinee; thus, the FCE was a "guide" that Dr. Lami took with "a grain of salt."

¶ 21    As long as a patient was healed, Dr. Lami never recommended not to return to work; however, where a patient says he "can't do it," Dr. Lami will respond, "okay, don't do it." From an objective standpoint, based on a MRI or x-ray. Dr. Lami might nonetheless opine that "there's no other reason than what they say" for why a patient cannot work. In this case, where plaintiff

had "a two-level spinal fusion which is healed without complication, there is no reason that he should not be able to do it, lift more than 50 pounds. Other than him saying I can not do it."

¶ 22    Dr. Lami opined that with a two-level fusion, plaintiff should be able to flex, extend, and rotate past 45 degrees, but that he demonstrated "quite a bit less" during the exam. Dr. Lami had plaintiff complete a pain disability questionnaire, but did not ask follow-up questions because the questions and answers were "very clear." He told plaintiff not to perform any maneuvers which caused pain or discomfort and did not physically manipulate plaintiff in any way because plaintiff was not his patient and to avoid an accusation of reinjury. His examination of plaintiff showed no weakness or paralysis of lower extremities and plaintiff did not show pain when Dr. Lami gently touched his back. Plaintiff rated his pain as 5 on a 10-point scale, indicated that his symptoms related to his neck, and stated that he could no longer work as a police officer.

¶ 23    Dr. Lami opined that plaintiff could return to "full duty" and was not disabled "from the cervical spine." Dr. Hennessy considered releasing plaintiff to work without restrictions and the CAT scan showed that the two-level spinal fusion healed. Additionally, records did not show a neurological deficit and showed the elimination of radicular symptoms which were "significant objective findings." Dr. Lami believed with a reasonable degree of medical certainty that plaintiff could drive a squad car at a high speed, subdue combative suspects, and fire a rifle in a prone position. He opined that plaintiff could return to work fully and without restrictions.

¶ 24    Dr. Lami stated that "truthfulness" about a patient's complaints regarding symptoms and limitations was for "the judge, jury and board members to decide," and that he based his opinion on "objective medical evidence." Objective data came from the neurological examination, diagnostics, and the surgical report, but asking a patient to move his neck relied on subjective

cooperation. Dr. Lami did not know whether plaintiff was exaggerating his symptoms, but stated that the type of surgery that plaintiff underwent was "one of the most successful *** a spine surgeon performs" and that 80% of patients do "well to extremely well."

¶ 25    On September 19, 2019, the Board held its second hearing.

¶ 26    Plaintiff testified that he was appointed as an officer to the Northlake Police Department in March 2007, and designated a detective in February 2014. On July 14, 2017, plaintiff, who was then assigned to the day shift, planned an "unannounced stop" at H.D. Supply in order to speak to a manager and collect video evidence of an employee theft as part of an ongoing investigation. Plaintiff also planned to stop at Midwest Recycling to speak with employees about locking the gates and activating cameras. This was not part of an ongoing investigation, but a reminder to prevent theft. Although detectives were not assigned to crime prevention activity, plaintiff explained that a self-motivated detective performed such tasks. He also had an 8:30 a.m. appointment with the general manager of the AmeriFreight (A.F.) Truck Center regarding employee theft, and a 9:15 or 9:30 a.m. meeting with a sheriff regarding medication destruction.

¶ 27    Around 8 a.m., plaintiff spoke with Detective Phil Gaske, who asked plaintiff to pick Gaske up after Gaske dropped his personal vehicle off for an oil change. This was a routine courtesy, but had to be authorized. Plaintiff agreed, but told Gaske to obtain authorization. Gaske told plaintiff that he obtained permission from Sergeant Juan Duarte, who had also asked Commander Barras, and that Barras gave permission.[3] At the hearing, plaintiff clarified that Gaske told plaintiff that Gaske obtained permission when Gaske picked plaintiff up from the emergency room after the accident. Plaintiff did not confirm with a supervisor whether he had permission to pick up Gaske.

_____

[3]The transcript does not contain Commander Barras's first name.

¶ 28    Plaintiff told Gaske to call plaintiff's cell phone when Gaske was ready to be picked up. He acknowledged that officers leaving Northlake in a police vehicle were to notify dispatch and that the dealership where he was to pick up Gaske was located outside of the city, but he did not advise dispatch prior to the accident. Around 8:05 a.m., plaintiff left the station to begin his planned "follow-ups." As plaintiff drove, he monitored the radio and looked for anything out of place or unusual that happened overnight, his "normal morning routine." If plaintiff were waved down by a citizen or observed criminal activity, he would have stopped.

¶ 29    At 8:17 a.m., plaintiff was on Grand Avenue approaching the intersection with Pearl Avenue when a vehicle turned in front of his vehicle and struck it. Plaintiff exited his vehicle and reported the accident over the radio. He was in shock, dazed, and had neck pain, like a "toothache" in the spine. He was taken to an emergency room, underwent x-rays, and was prescribed medication. Plaintiff visited his family doctor the same day, and she recommended medication and physical therapy.

¶ 30    During the next two to three months, plaintiff could not turn his head and "jerking" movements caused a "lot of pain." He underwent an MRI to the cervical spine on October 4, 2017, and was referred to Dr. Hennessy, an orthopedic specialist. Dr. Hennessy diagnosed disc herniations, prescribed medication, and referred plaintiff to a pain specialist for injections. Plaintiff received four shots to the neck, which provided temporary relief. However, he had pain when he moved his head. On July 11, 2018, plaintiff underwent surgery. He then continued physical therapy and participated in a work conditioning program at Athletico, but was still in pain and had difficulty turning his head.

¶ 31    On December 19, 2018, plaintiff underwent a FCE and wore a 20-pound vest while he crawled, walked, and simulated wrestling with suspects. Plaintiff was not able to bend his neck or wrestle with his full strength as the vest put pressure on his neck. The FCE report released him to work with a 50-pound lift restriction and limited his ability to drive in emergency situations due to loss of motion in the cervical spine. Dr. Hennessy reviewed the FCE report, and, on December 21, 2018, released plaintiff to work with a 25-pound lift restriction and no prisoner or suspect contact. Plaintiff emailed these restrictions to the chief of police, but never received a response.

¶ 32    Prior to the work release, plaintiff submitted a disability pension application to the Board. During the evaluations,  Drs. Wehner and Hsu each spent approximately 30 minutes with him. Dr. Lami spent 10 minutes with plaintiff and did not manipulate his head or neck, but asked plaintiff to turn to each side slowly. Dr. Lami did not ask about plaintiff's responses on a pain questionnaire.

¶ 33    Currently, plaintiff noticed a decreased range of motion in the neck, as he could no longer look over his shoulder. He had a "dull" pain in his spine when he strained his neck, and walking "distances" led to tightness around the neck and shoulders. While he could lift to the waist, lifting overhead caused pain. He had not attempted to exercise with weights outside of physical therapy and had not shot a firearm. Plaintiff did not take medication or wear a neck brace; rather, he occasionally iced his neck and refrained from movements that caused pain. On September 4 or 5, 2019, plaintiff began a security job at a high school. He walked the hallways and monitored students, but did not intervene in any incidents. Plaintiff did not feel he could control suspects, qualify with a firearm, respond to emergencies, clear intersections, or look for other squad cars because he could not see "if anyone is coming from the sides."

¶ 34   During cross-examination, plaintiff testified that he was not present when Gaske asked permission for plaintiff to pick him up. Plaintiff drove around town almost every day, but did not "engage in any specific law enforcement activity" while driving on the morning of the accident. In his application for disability benefits, plaintiff stated that the accident occurred when he was "patrolling for unusual activities." He was not pursuing any suspects, but was "keeping [his] eyes open for anything unusual," and stated that driving around looking for unusual activity was part of a police officer's duties. He believed this was also the job description for a detective. Plaintiff had seen the job description for a police officer, which included patrolling the city and checking doors and windows. He acknowledged that those specific duties were not listed in the "police detective" job description. Sergeant Duarte, plaintiff's supervisor, did not instruct him to patrol for unusual activities. He was unsure who took over his investigations after the accident, and did not speak to Duarte about reassignments.

¶ 35   During redirect, plaintiff testified that when he first entered the detectives' division, the commander told him that detectives were self-motivated, self-driven, and worked at their own pace. As long as work was completed, they did not need special supervision or direction.

¶ 36   Gaske testified that on July 14, 2017, he asked Duarte if he could take his personal vehicle for an oil change, and if plaintiff could then pick him up. Duarte approved. Once Gaske told plaintiff that Duarte gave permission, plaintiff said he would meet Gaske at the dealership on Grand. The drive to the dealership was about 10 minutes. As Gaske drove, he heard about plaintiff's accident on the radio and returned to the station.

¶ 37    During cross-examination, Gaske testified that plaintiff indicated his willingness to pick Gaske up, as long as Gaske obtained permission from a supervisor. Gaske did not see which direction plaintiff drove upon leaving the station.

¶ 38    Gaske did not routinely patrol the streets; rather, he worked at his desk on matters he was assigned. Normally, he did not initiate investigations, but he if saw something, he would not ignore it. He was assigned to the truck stop employee theft case in January 2018, and did not remember being told that plaintiff previously spoke to A.F. Truck Center manager Hristo Hristov about the investigation. Gaske's caseload was never low enough that he voluntarily went on patrol.

¶ 39    Hristov testified that he managed A.F. Truck Center in Northlake. In 2017, Hristov spoke with plaintiff about an employee theft, and arranged a meeting, but plaintiff did not appear because of the accident. Hristov then worked with Gaske. He knew plaintiff because they were both Bulgarian, and plaintiff was a "little hero" for the community.

¶ 40    Northlake police department investigations commander Juan Duarte testified that in July 2017, he was the detective sergeant. On the morning of July 14, 2017, he met with plaintiff and Gaske at the beginning of the day shift. Gaske asked to take his vehicle for an oil change, and for plaintiff to pick him up. Duarte approved. He did not know which direction plaintiff drove and did not ask his superiors for permission for plaintiff to pick up Gaske.

¶ 41    Plaintiff did not state that he would be performing "job-related" duties or making stops for ongoing investigations on the way to the dealership. It was not normal for detectives under Duarte's supervision to drive around looking for unusual activities; rather, their main function was to follow up on reports taken by patrol officers. Duarte never assigned plaintiff to patrol for unusual activities. There were policies to "mitigate issues" like a detective initiating an investigation and a

detective was required to notify supervisors of any actions. Duarte did not think that the truck stop case was assigned to plaintiff. When a detective left the building, Duarte was informed where he or she was going. Detectives were required to notify dispatch when they left city boundaries.

¶ 42 Photographs taken at the accident scene were entered into evidence and are included in the record on appeal. They show a sedan with damage to the side.[4]

¶ 43 In rebuttal, plaintiff testified that Duarte was not present when Gaske asked plaintiff to take Gaske to the dealership, and denied speaking to Duarte that morning. He denied that detectives had to notify a supervisor when leaving the station. Plaintiff was never disciplined for initiating an investigation; rather, he was applauded for it. He did not take the same route as Gaske to the dealership because it was the longer route. On the day of the accident, he did not know when Gaske left or what direction Gaske went.

¶ 44 On December 11, 2019, the Board heard closing arguments. Plaintiff's counsel asserted sufficient evidence supported the conclusion that plaintiff was disabled due to an injury that required his retirement from "performing" police service, noting the permanent work restrictions that Dr. Hennessy recommended on December 21, 2018, based upon the FCE results. Additionally, Dr. Wehner and Dr. Hsu found plaintiff disabled. The evidence also supported the conclusion that plaintiff was injured from "the performance of an act of duty," as he was acting as a police officer at the time of the accident. The City responded that plaintiff was traveling to a dealership to pick up Gaske rather than acting as a police officer. Additionally, Duarte, plaintiff's supervisor, denied that plaintiff stated he planned to perform job-related duties on the way. Turning to plaintiff's

---

[4]The quality of the scanned photos is low. They are black-and-white, and depict a sedan without front end damage. The damage appears to be to the side of the vehicle.

physical condition, the City noted that the FCE, as Dr. Lami explained, was subjective and entailed plaintiff asserting that he could not return to work.

¶ 45 After deliberating in closed session, the Board approved a motion to deny plaintiff disability benefits based upon a finding that he was not disabled.

¶ 46 On February 3, 2020, the Board entered an order finding that plaintiff had not proved that he was "physically disabled for service" in the police department. He was therefore not entitled to either a line-of-duty or a not-on-duty pension. The Board acknowledged that plaintiff was involved in a vehicle accident on July 15, 2017, but found the photos from the accident showed "less than catastrophic or severe damage" to the front of plaintiff's squad car. The air bag did not deploy and, immediately following the accident, plaintiff exited the vehicle and could walk. While plaintiff noticed neck pain after the accident, he was discharged from the emergency room that day.

¶ 47 Turning to plaintiff's medical history, the Board noted that Dr. Hennessy reported that plaintiff reported no radicular or scapular pain, tingling, numbness, or weakness following surgery, and that by October 19, 2018, Dr. Hennessy opined that if a follow-up MRI showed a solid fusion and plaintiff's symptoms continued to improve, he would likely return plaintiff to unrestricted duty. The Board also noted that plaintiff progressed in his work hardening and by November 3, 2018, had met 52.38% of job demands. At that time, however, plaintiff "subjectively" presented with decreased cervical range of motion and mentioned a " 'fear avoidance' " of rapid cervical motion. Moreover, the third FCE concluded that plaintiff could perform 95.24% of his job demands, and that the only duty he could not perform was driving under certain emergency circumstances. The Board noted that plaintiff raised this "subjective concern," which the therapist accepted without testing his driving. Dr. Hennessy, after reviewing the FCE and plaintiff's

subjectively stated range of motion limitations, imposed a lifting restriction of 25 pounds. Thus, according to the Board, Dr. Hennessy and the Athletico therapist deferred to plaintiff's "subjective presentation" and imposed restrictions that were not supported by the evidence.

¶ 48 The Board afforded substantial weight to Dr. Lami's conclusion that plaintiff was not disabled, as he reviewed plaintiff's records and performed a clinical examination, was a board-certified orthopedic surgeon specializing in treatment of the spine, and explained his opinion during the deposition. Dr. Lami found that the objective medical evidence of the cervical fusion was normal. Dr. Lami testified there was a difference between restrictions imposed based upon a patient's fear of reinjury and a provider rendering an opinion on disability based upon objective evidence, and explained why plaintiff's cervical range of motion presentation was subjective rather than objective evidence.

¶ 49 The Board afforded less weight to Dr. Wehner's and Dr. Hsu's findings that plaintiff was disabled, which rested on plaintiff's subjective range of motion presentation and the FCE's conclusion that plaintiff should avoid driving in emergency situations when the FCE was based on plaintiff's fear of reinjury rather than objective medical evidence. The Board noted that Dr. Wehner found that other than plaintiff's subjective cervical range of motion presentation, all of his other clinical findings were normal. Based on the foregoing, the Board accorded significant weight to Dr. Lami's testimony that within a reasonable degree of medical certainty, plaintiff was not disabled due to a cervical spine condition, and concluded that plaintiff did not prove that he was physically disabled so as to render necessary his suspension or retirement from police service.

¶ 50 Finally, the Board noted that although plaintiff complained of "near constant dull pain" and stated he had difficulty walking, he did not take medication or wear a neck brace and took a

job where his "main job" was walking. The Board observed plaintiff at the hearings and found that his "physical presentation" did not "comport" with the limited range of motion that he subjectively reported. Additionally, inconsistencies between plaintiff's testimony and that of other witnesses regarding the events leading to the accident affected plaintiff's credibility and led the Board to "discount" his subjective statements regarding his pain levels and cervical range of motion. As plaintiff did not establish that he was disabled, the Board did not address whether his alleged disability resulted from, or was incurred, in the line of duty.

¶ 51    On March 3, 2020, plaintiff filed a complaint for administrative review in the circuit court, seeking review of the Board's decision to deny him disability pension benefits, reversal of the decision, and the award of line-of-duty pension benefits retroactive to July 14, 2018.

¶ 52    Plaintiff thereafter sought leave to supplement the administrative record with 150 pages of Athletico records that were not submitted to the Board, or, in the alternative, to remand the cause to the Board for consideration of this additional evidence. Plaintiff alleged that after the Board issued its decision, he requested his records from Athletico, and the records he received included these pages. These records were not attached to the motion, and are not included in the record on appeal. On March 2, 2021, following argument, the circuit court denied the motion.

¶ 53    The parties briefed the case before the circuit court, which held a hearing on September 8, 2021.[5] On October 19, 2021, the court affirmed the Board's final administrative decision that plaintiff was not disabled in a written order. Because the court found that the Board's determination

_____

[5]The circuit court's order indicates that a court reporter was present at the hearing. However, the record on appeal does not contain a report of proceedings for the hearing.

that plaintiff was disabled was not against the manifest weight of the evidence, the court did not address whether the accident resulted from, or was incurred in, the performance of an act of duty.

¶ 54   On appeal, plaintiff first contends that the Board's decision to deny his application for pension benefits was against the manifest weight of the evidence. He argues that "every doctor and physical therapist" except Dr. Lami concluded that he was "disabled" from performing the unrestricted duties of a police officer "at the present time."

¶ 55   A police officer is entitled to a line-of-duty pension if, "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, [he or she] is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service." 40 ILCS 5/3-114.1(a) (West 2018). The Illinois Pension Code (Code) defines a disability as "[a] condition of physical or mental incapacity to perform any assigned duty or duties in the police service." 40 ILCS 5/5-115 (West 2018). Pursuant to the Code, the board of trustees of a pension fund verifies an applicant's disability and right to receive benefits. 40 ILCS 5/3-114.1(d) (West 2018).

¶ 56   Appeals from administrative hearings are governed by the Administrative Review Law. See 735 ILCS 5/3-101 *et seq.* (West 2018). We review the decision of the Board, not the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). Our review extends to all questions of fact and law the record presents, but judicial review is strictly limited to the administrative record. *Id.* at 531-32. We may not consider new or additional evidence beyond what was originally presented to the administrative agency. 735 ILCS 5/3-110 (West 2018).

¶ 57   The applicable standard of review depends on the question presented. *Marconi*, 225 Ill. 2d at 532. As to questions of fact, an agency's decision will not be reversed on appeal unless it is

against the manifest weight of the evidence. *Id.* Questions of law, however, are subject to *de novo* review, and mixed questions of fact and law are reviewed under the clearly erroneous standard. *Id*. Regardless of which standard of review applies, a plaintiff in an administrative proceeding bears the burden of proof and will be denied relief if he or she fails to sustain that burden. *Id*. at 532-33.

¶ 58     A pension board's determination as to whether a person is disabled for service as a police officer is a question of fact. See *id*. at 534. The "findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct." 735 ILCS 5/3-110 (West 2018). It is within the Board's province to assign the appropriate weight to the evidence, resolve conflicts presented by it, and determine the credibility of the witnesses. *Prawdzik v. Board of Trustees of the Homer Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024, ¶ 36. However, a reviewing court's deference to the Board is not limitless (*Ashmore v. Board of Trustees of the Bloomington Police Pension Fund*, 2018 IL App (4th) 180196, ¶ 41), as there must be "competent evidence" in the record to support its findings (*Miller v. Board of Trustees of the Oak Lawn Police Pension Fund*, 2019 IL App (1st) 172967, ¶ 40). A reviewing court may not reweigh the evidence or make an independent determination of the facts. *Hoffman v. Orland Firefighters' Pension Board*, 2012 IL App (1st) 112120, ¶ 18.

¶ 59     Therefore, we will not reverse the Board's determination as to whether plaintiff is disabled in this case unless it is against the manifest weight of the evidence. See *Marconi*, 225 Ill. 2d at 534. Reversal is warranted under the manifest weight of the evidence standard, " 'only if the opposite conclusion is clearly evident.' " *Id*. (quoting *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992)). That the opposite conclusion is reasonable or that a reviewing court might have ruled differently if it were the trier of fact is not enough to justify

a reversal. *Id*. If the record contains evidence that supports the Board's factual conclusions, then we will not upset those findings, even if an opposite conclusion is also reasonable. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund of the City of Carbondale, Ill.*, 177 Ill. 2d 533, 538 (1997). The applicant bears the burden to establish that he or she is entitled to either a line-of-duty or nonduty disability pension. *Marconi*, 225 Ill. 2d at 536.

¶ 60    In finding that plaintiff failed to demonstrate that he was disabled, the Board credited the opinion of Dr. Lami over the opinions of Drs. Wehner and Hsu. The Board noted that Dr. Lami, a board-certified orthopedic surgeon specializing in spines, reviewed plaintiff's medical and physical therapy records and concluded that the objective clinical findings, including the cervical fusion, were normal. Dr. Lami also explained the difference between restrictions imposed upon a patient based upon that patient's subjective fear of reinjury and a medical professional opining as to disability based upon objective evidence. He further explained that plaintiff's cervical range of motion presentation, which was controlled by plaintiff, was subjective evidence.

¶ 61    The Board also noted that plaintiff progressed in work hardening and by November 3, 2018, had met 52.38% of job demands. At the same time, however, plaintiff presented with decreased cervical range of motion and mentioned a fear of rapid cervical motion. Although the final FCE concluded that plaintiff could perform 95.24% of his job demands, and that the only duty he could not perform was driving under certain emergency circumstances, the Board noted that Athletico accepted plaintiff's "subjective concern" regarding his ability to drive rather than testing his driving. Additionally, Dr. Hennessy, after reviewing the FCE and plaintiff's self-stated range of motion limitations, imposed a lifting restriction of 25 pounds, deferring to plaintiff's "subjective presentation" although it was not otherwise supported by the evidence.

¶ 62    The Board acknowledged that Dr. Wehner and Dr. Hsu both opined that plaintiff was disabled, but afforded less weight to those opinions because they rested on plaintiff's subjective range of motion presentation and the FCE's conclusion that he should avoid driving in emergency situations. The FCE, in turn, was based on plaintiff's statements about reinjury rather than objective medical evidence and plaintiff's driving was never tested. The Board highlighted Dr. Wehner's conclusion that all of plaintiff's clinical findings were normal, other than his subjective cervical range of motion presentation.

¶ 63    While Dr. Wehner concluded that plaintiff was disabled, she also noted that although plaintiff reported that his pain worsened with high levels of activity, the FCE showed that he was able to fulfill almost all of his job duties. Dr. Wehner opined that plaintiff was "exceptionally close" to full release and with self-motivated exercise and physical therapy, his range of motion "should improve" enough to permit "full duty as a police officer."

¶ 64    It was for the Board to determine which medical opinion was to be accepted. See *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 514 (2007) ("The decision regarding disability is for the board, not any individual physician."). Faced with conflicting evidence, the Board, as the finder of fact, assessed the credibility of the documentary information and witness testimony to determine the appropriate weight to give that evidence. *Marconi*, 225 Ill. 2d at 540. In this case, there was competent medical evidence in the form of Dr. Lami's medical opinion supporting the Board's conclusion that plaintiff was not disabled.

¶ 65    In determining that plaintiff was not disabled, the Board also considered that the photos of the accident showed "less than catastrophic" damage to plaintiff's squad car, the airbag did not deploy, and plaintiff was ambulatory, Further, although plaintiff alleged "near constant dull pain"

and difficulty walking, he did not take medication or wear a neck brace and took a job where he walked. Finally, the Board stated that its own observation of plaintiff's "physical presentation" did not "comport" with his self-reported limited range of motion, and inconsistencies between plaintiff's, Gaske's, and Duarte's testimony as to the events leading to the accident led the Board to question plaintiff's credibility. Consequently, the Board "discount[ed]" his self-reported pain levels and cervical range of motion. See *Olson v. Lombard Police Pension Fund*, 2020 IL App (2d) 190113, ¶ 50 ("We will not disturb the Board's credibility findings against plaintiff as they are based on the evidence.").

¶ 66    Plaintiff, however, argues that the Board erred by relying on Dr. Lami's opinion, which "completely" discounted plaintiff's subjective complaints and other medical evidence including the FCE. Plaintiff relies on *Kouzoukas v. Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 234 Ill. 2d 446 (2009), for the proposition that a subjective complaint of pain can support a disability finding.

¶ 67    In that case, a Chicago police officer injured her back when she attempted to move an intoxicated man off a sidewalk and he resisted. *Id.* at 448. The officer underwent a course of medical treatment and saw several doctors, one of whom, Dr. Spencer, opined that the officer's back pain was aggravating but not incapacitating. *Id.* at 450-52. At the hearing on her disability application, the officer's treating physician, Dr. Yapor, a neurosurgeon, testified that his physical examination revealed objective evidence of pain, namely, localized tenderness in her lower back. *Id.* at 454. Dr. Yapor testified that based on his observations, the officer suffered from lower back pain in her sacroiliac joint which caused her to have difficulty sitting or standing for any period of time. *Id.* Dr. Yapor did not believe that the officer was malingering. *Id.*

¶ 68 The Board's physician testified that when he examined the officer he noticed " 'an abnormal and marked spasm (or tightening) of the paraspinal muscles on the left from T7 to the lower lumbar.' " *Id*. at 456. The Board's physician also observed that the officer exhibited decreased ability in her flexion and lateral bending. *Id*. As a result, the Board's physician concluded that the officer suffered from " 'myofascial pain syndrome,' " that is, " 'a dysfunction of her muscles, ligaments, and tendons of her lower back.' " *Id*. The Board's physician also testified that the officer showed no signs of malingering. *Id*. at 456-57. According to the physician, returning the officer to unrestricted duty " 'would not be prudent.' " *Id*. at 457. The Board denied the officer benefits based in part on the report of Dr. Spencer. *Id*. at 461-62.

¶ 69 The Illinois Supreme court reversed the Board's finding on the basis that it was against the manifest weight of the evidence noting, relevant here, that the doctors' examinations revealed that the officer had back spasms, point tenderness, and decreased range of motion. *Id*. at 465-66.

¶ 70 *Kouzoukas* is distinguishable from the instant case. In *Kouzoukas*, doctors observed objective evidence of pain, that is, muscle spasms. Here, on the other hand, Dr. Lami testified that plaintiff did not show pain when Dr. Lami gently touched his back. To the extent that plaintiff argues Dr. Lami's opinion should be discounted because Dr. Lami did not maneuver plaintiff's neck during the examination, Dr. Lami explained that he was not plaintiff's physician and wanted to avoid accusations of reinjury. Dr, Lami also acknowledged that it was not his place to tell patients to perform activities that would hurt, as he did not know whether an action hurt or not.

¶ 71 Based on the record, it is not clearly evident that the Board should have reached the opposite conclusion, that is, found that plaintiff met his burden to establish he was disabled. See *Marconi*, 225 Ill. 2d at 534. It is not this court's function to reweigh the evidence or make an

independent determination of the facts (*Hoffman*, 2012 IL App (1st) 112120, ¶ 18) and the record contains evidence supporting the Board's conclusion that plaintiff was not disabled (*Robbins*, 177 Ill. 2d at 538). The Board's decision to deny plaintiff disability benefits was therefore not against the manifest weight of the evidence (*Marconi*, 225 Ill. 2d at 534), and we affirm the circuit court's judgment affirming the Board's decision.[6]

¶ 72    Plaintiff next contends that the circuit court erred when it denied his motion to supplement the administrative record, or, in the alternative to remand for the Board to consider the 150 pages of Athletico records omitted from the administrative record. He argues that these records, which "focused" on his pain complaints and range of motion during physical therapy, "may have been extremely relevant" to Dr. Lami's analysis of whether plaintiff was disabled.

¶ 73    Section 3-110 of the Administrative Review Law states:

> "Every action to review any final administrative decision shall be heard and determined by the court with all convenient speed. The hearing and determination shall extend to all questions of law and fact presented by the entire record before the court. No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court." 735 ILCS 5/3-110 (West 2018).

¶ 74    Here, it is undisputed that the 150-pages at issue were omitted from the Athletico records utilized during the proceedings before the Board. Thus, the circuit court was prohibited from considering that additional evidence because its review was limited to the evidence presented to

---

[6]Although the parties ask this court to further determine whether plaintiff was entitled to a line-of-duty or not-on-duty pension, we decline to do so, as the Board did not render a final administrative decision on this issue.

the Board. *Id.*; see also *Rodriguez v. The Sheriff's Merit Comm'n of Kane County*, 218 Ill. 2d 342, 349-50 (2006) ("The Administrative Review Law was an innovation and a departure from the common law, and the procedures established therein must be followed"); *Deen v. Lustig*, 337 Ill. App. 3d 294, 304-05 (2003) (denying police officer's motion to supplement the record on appeal with documents that were not introduced at the administrative proceeding).

¶ 75    To the extent plaintiff argues that the court erred by declining to remand the cause to the Board so that it might consider this additional evidence, the record reflects that the court heard argument, and thereafter declined to either supplement the record or remand the cause to the Board.

¶ 76    On appeal, the appellant, in this case plaintiff, has the burden to provide a complete record for review in the appellate court to support a claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). If no such record is provided, "it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Id.* at 392. This is because, in order to determine whether there was actually an error, a reviewing court must have a "sufficiently complete record" before it to review. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156 (2005).

¶ 77    Here, the record on appeal does not contain a report of proceedings from the hearing on the motion to supplement or an acceptable substitute such as a bystander's report or agreed statement of facts pursuant to Supreme Court Rule 323. See Ill. S. Ct. R. 323(a), (c), (d) (eff. July 1, 2017). Without a report of proceedings or an acceptable substitute, we cannot determine what arguments were presented to the circuit court, or the court's reasoning in declining to supplement the record or remand the cause to the Board. Under these circumstances, we must presume that the court acted in conformity with the law and ruled properly after considering the evidence before it.

*Corral*, 217 Ill. 2d at 156-57. Absent a report of proceedings or other record of the hearing, we have no basis for disturbing the circuit court's judgment. *Foutch*, 99 Ill. 2d at 391-92.

¶ 78    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County confirming the decision of the Board denying plaintiff disability pension benefits based on its finding that plaintiff was not disabled and denying plaintiff's motion to supplement the record, or, in the alternative, to remand the cause to the Board for the consideration of additional evidence.

¶ 79    Affirmed.